# Illinois Official Reports

## Appellate Court

---

### *Givens v. City of Chicago*, 2021 IL App (1st) 192434

---

| | |
|---|---|
| Appellate Court Caption | JOHN W. GIVENS, LELAND DUDLEY, and THERESA DANIEL, as Special Administrator of the Estate of David Strong, Deceased, Plaintiffs-Appellants, v. THE CITY OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Nos. 1-19-2434, 1-19-2457 cons. |
| Filed | September 28, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-10768; the Hon. Bridget J. Hughes, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Robert J. Napleton, Brion W. Doherty, and David J. Gallagher, of Motherway & Napleton, LLP, of Chicago, and Lynn D. Dowd, of Naperville, for appellants John W. Givens and Theresa Daniel.<br><br>Alexander McH. Memmen, of The Memmen Law Firm, LLC, of Chicago, for other appellant.<br><br>Celia Meza, Acting Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Elizabeth Mary Tisher, Assistant Corporation Counsel, of counsel), for appellee. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.


**OPINION**


¶ 1        On April 30, 2012, around 2 a.m., John W. Givens, Leland Dudley, and David Strong, now deceased, burglarized an electronics store in Chicago, then attempted to escape in a stolen getaway van. However, police appeared, bearing guns and firing some 76 rounds at the van as it burst through the store's garage door. The three burglars were shot multiple times, and Strong died of his injuries. Following a joint criminal jury trial, Givens and Dudley were found guilty of felony murder, since Strong was killed (albeit by police gunfire) during the course of their felony burglary. They were also found guilty of aggravated battery of a police officer and possession of the stolen van. Givens was sentenced to a total of 32 years' imprisonment, while Dudley was sentenced to a total of 37 years. Their criminal convictions were affirmed on appeal. See *People v. Givens*, 2018 IL App (1st) 152031-U; *People v. Dudley*, 2018 IL App (1st) 152039-U.

¶ 2        In an unlikely turn of events, Givens and Dudley, along with the special administrator of Strong's estate, Theresa Daniel,[1] filed a civil suit against the City of Chicago (City) for their injuries and Strong's death by police gunfire. Specifically, they alleged battery, survival, and wrongful death. Although Givens and Dudley's battery claims did not survive summary judgment due to collateral estoppel from their criminal convictions, Strong's estate proceeded to trial on its survival, wrongful death, and willful and wanton claims against the City. Ultimately, Strong's estate prevailed, obtaining a $1,999,998 jury verdict. The jury nevertheless also found that Strong, as the burglar, was contributorily willful and wanton as alleged by the City, where his injuries were proximately caused by his own conduct. Accordingly, the verdict was reduced to $999,999.

¶ 3        The City filed a motion for a judgment notwithstanding the verdict based on two special interrogatories inquiring whether the officers were unjustified in the shooting and were truly willful and wanton, *i.e.*, intentional or reckless. Since the jury answered "No" to the questions, the City claimed these interrogatories controlled over the general verdict, and the trial court granted the City's motion. As such, the City ultimately won at trial.

¶ 4        In this consolidated appeal, Givens and Dudley[2] challenge the summary judgment entered against them, claiming there was no identity between the criminal and civil issues to support collateral estoppel, while Strong's estate challenges the judgment notwithstanding the verdict against it. Strong's estate argues that based on Illinois Supreme Court precedent, the City was precluded from alleging Strong was contributorily willful and wanton without first alleging he was contributorily negligent. The estate further challenges the special interrogatories as

---

[1]The special administrator of Strong's estate at the time of the original complaint was Beatrice Strong.
[2]We note that Dudley has adopted the appellate briefs and appendix filed on behalf of both Strong and Givens. Although filed in an untimely manner, the City has not objected to Dudley's motion. Dudley likewise adopted Strong's motion contesting the City's summary judgment, filed in the trial court.

improper in a variety of ways and raises a number of trial errors. The estate argues first that we must reinstate the full verdict and alternatively reinstate the reduced verdict, and if all else fails, that we reverse and remand for a new trial. We reinstate the $999,999 reduced verdict for Strong's estate and reverse the summary judgment entered against Givens and Dudley.

¶ 5                                                     BACKGROUND

¶ 6        The evidence at Strong's trial—consisting of testimony, surveillance video, and exhibits—showed that Givens, Dudley, and Strong broke into Mike's Electronics (2459 South Western Avenue), located along the corner of Western Avenue and 25th Street in Chicago, by prying open an air conditioning grate and climbing through. Once inside this car electronics store, they loaded merchandise into a van parked in the adjoining garage. Meanwhile, the break-in had been reported to 911 by the upstairs tenant, and 19 police officers appeared a short while later, casing the entry and exit points and creating a perimeter so as to preclude the burglars' escape. Police repeatedly announced their presence and identity as "Chicago Police," while also aiming flashlights through the showroom windows, located at Western Avenue and 25th Street, and the garage where the burglars were located. Police stated the building was surrounded and ordered the burglars to exit with their hands up. The surveillance video showed the burglars knew the police were there. For example, one saw their flashlights through the showroom window and hid behind a display wall for a short time before ducking to run into the adjoining garage, where he loaded more goods inside the van. Another burglar sought to enter the showroom, but on seeing the flashlights, turned back into the garage.

¶ 7        Officers surrounded the building's south-facing, locked metal garage door. Ultimately, about nine were situated on the east side, while three officers were immediately west of the garage, including Officer Michael Papin, who stood just next to it. Police attempted to open the garage door and used flashlights to illuminate the underside, but they were only able to lift it several inches, prompting one of the burglars to jump back, as shown in the surveillance video. Police shook the door with a loud banging sound, kicked it, again letting the burglars know they were outside, surrounded, and had "nowhere *** to go."

¶ 8        Meanwhile, several officers had entered a side service door east of the garage into the vestibule area and managed to kick a hole in the bottom of an inner door that had been barricaded but led inside the garage. On looking in, for example, one officer saw the van's taillights flash on, then saw the van in reverse, and shouted "they're coming out." Officer Adrian Valadez saw these same headlights, only through the Western Avenue showroom window, and testified that he informed Officer Papin, standing by the garage door on the west side, to "be careful." In a sworn statement given hours after the incident, Officer Valadez acknowledged he had stated "move out of the way" because the van was coming out. Also, about one minute before the van moved, Officer Jeremy Lorenz, who was located by the Western Avenue window, radioed the emergency dispatcher, who in turn broadcast the message that the van lights were activated and the vehicle possibly exiting the building (the surveillance video confirmed this timing of van lights' activation). Most officers by the garage nevertheless claimed not to hear these two warnings on their radios.

¶ 9        Following these warnings, the van then burst through the metal garage door before crashing into a vehicle parked along the driveway, pushing it into another on the street; officers claimed the van lurched forward but ultimately came to a stop. Officers described the van bust and verbal warnings as happening almost simultaneously, thus taking officers off guard. They

never imagined the van would burst through the garage door, notwithstanding the prior warnings. Officers on both the east and west side of the garage testified they believed Officer Papin not only had been struck by the van but also was being dragged underneath and was possibly dead. Indeed, the video shows that just as the van bursts forth, Officer Papin hops back with arms outstretched appearing to be clipped by the backside of the van; however, he ultimately gains his footing and runs away while shots ring out. At trial, Officer Papin testified that the van struck his left hip, although it caused only pain and bruising.

¶ 10    With the domino effect in full swing, this all prompted eight officers to begin firing, mostly aiming at the driver, until the van's wheels were "shot out" and it was immobile. Officer Michael Curry on the west side (near Officers Papin and Valadez) fired his gun 18 times at the driver but did not know what or who he hit. He shot, notwithstanding that Officer Papin ran right in front of him away from the scene. Officer Curry stopped firing when the van ceased moving, perceiving the threat over. Officer Manuel Gonzalez, on the other side of the garage inside the vestibule by the service door, fired his gun some three times because he thought the offenders were shooting at officers in an attempt to escape. Officers also testified they were in fear that the van would drive right back towards them, with three testifying they saw Dudley (the driver) place it in drive or make similar such motions. Officer Daniel Lopez, for example, testified that he fired six shots aimed at the driver as the van lurched forward because he had seen Dudley moving his right arm up and down and believed the van might kill the officers in front of him. Officer Terrence Pratscher, who had already fired 11 shots at the driver, believing Officer Papin was struck, then fired a second time after observing the van lurch forward and Dudley place it in drive.

¶ 11    In fact, officers fired about 76 rounds at the van in an attempt to disable it, and the gear shift was later confirmed to be in "drive." Yet, no weapons were ultimately found on the burglars or inside the van, although there was testimony that the van itself could constitute a "deadly weapon." As set forth, the burglars claimed they turned victim because of the excessive force. The driver Dudley was shot six times; Strong, who was the front-seat passenger, was also shot eight or nine times; and Givens, who was the back-seat passenger, was shot six times. Following criminal proceedings, Givens and Dudley were convicted of stealing the van, the aggravated battery of Officer Papin, and murdering Strong. Thus, at the time of the civil trial, they were serving their 30-year-plus prison terms.

¶ 12    The parties also presented dueling experts as to whether the use of deadly force was justified. Dr. Geoffrey Alpert, for Strong's estate, asserted the shooting was unjustified since the vehicle was not utilized as a deadly weapon but rather as a method of escape for the burglars to avoid arrest. At that point the threat was over and no longer imminent. Dr. Alpert believed that officers had time to move from the van's path before shooting at it and opined officers violated police department orders by disregarding radio warnings and failing to remove themselves from the van's path. Dr. Alpert noted, for example, that it soon became clear that Officer Papin had not been hit, dragged underneath the vehicle, or, in his opinion, injured at all by the van. At that point, the danger to Officer Papin and the other officers had passed. In addition, Dr. Alpert believed that the van did not drive forward but ricocheted off the other car a small distance and then stopped on the deflated tire. Dr. Alpert asserted that officers instead engaged in "contagion fire" by shooting at the van without determining if there was a true threat. He noted deadly force was a last resort requiring an exact target. Dr. Alpert opined that the officers' behavior was willful and wanton, excessive, unreasonable, and unwarranted.

- 4 -

¶ 13    On the other hand, the City's expert, Roy G. Taylor, maintained that deadly force was justified where the burglars exhibited a disregard for human life, since they knew the officers were outside the garage, yet still used the van as a deadly weapon to effect their escape after committing the forcible felony of burglary. He noted Illinois law permitted deadly force after a forcible felony where injury or the likelihood of injury was prevalent. He added that police believed Officer Papin had been struck, further justifying deadly force. Taylor cited the policy that police can shoot into a vehicle if they reasonably believe it is necessary to prevent death or great bodily harm. Moreover, there was testimony that had the van not been disabled, but continued to drive forward, officers would have had only about one second to react before the van reached them.

¶ 14    In closing, Strong's estate argued the police wrongfully killed Strong and that Strong's then 10-year-old son was entitled to $7.5 million for his death. Strong's estate specifically argued that the police were reckless in their failure to heed the radio and in-person verbal warnings that the van was about to burst through the garage, and they had other options than to simply wield their weapons using deadly force. As such the estate's attorney further argued police fired their guns without legal justification, whether out of fear or simply because others were firing, and thereby killed Strong in an intentionally, or at least, recklessly willful and wanton manner. He argued "[t]here was an actual intent to harm. But if it wasn't intentional, certainly—certainly there was a conscious disregard for Mr. Strong's safety that caused his injury." The estate's attorney noted that while Strong had certainly "done something stupid" in deciding to burglarize the store and escape as he did, Strong "did not deserve to die by firing squad."

¶ 15    The defense asserted that the estate's argument could be summed up in one sentence: "You should award us money because you knew that we were about to come out of the door and you decided not to get out of our way." The defense argued Strong was at fault since he knew the police were outside yet chose to ram his car into them anyways after having committed a forcible felony of burglary, thus showing a complete disregard for human life. The defense argued that officers, many of whom were war veterans and with families, had only seconds to react to the van bursting forth from the garage in what placed officers in imminent fear of death or great bodily harm. Thus, the defense maintained police were justified in using deadly force for a variety of reasons.

¶ 16    At the close of arguments, the jury received three different verdict forms, verdict form A for the Strong's estate showing no contributory fault; verdict form B for Strong's estate but assigning some fault to Strong; and verdict form C for the City. The jury chose verdict form B, ruling in favor of Strong's estate and awarding it $1,999,998. The jury nevertheless also found that Strong, as the burglar, was 50% at fault for his injuries due to his own willful and wanton conduct, and the jury reduced the verdict by about half to $999,999.

¶ 17    In addition, the jury answered three special interrogatories, which were prepared and written by the court. Special interrogatory No. 1 asked,

> "At the time deadly force was used, did the Chicago Police Officers who used deadly force engage in a course of action without legal justification, which showed an actual or deliberate intention to harm David Strong?"

Special interrogatory No. 2 asked,

"At the time deadly force was used, did the Chicago Police Officers who used deadly force engage in a course of action without legal justification, which showed an utter indifference or conscious disregard for the safety of others?"

Special interrogatory No. 3 asked,

"At the time deadly force was used against David Strong, did the Chicago Police Officers who used deadly force reasonably believe that such force was necessary to prevent imminent death or great bodily harm?"

The jury answered "No," to all three special interrogatories, and the court permitted the parties to brief the matter before entering judgment on the verdict.

¶ 18  The City moved for entry of judgment in its favor based on the special interrogatories, arguing that the answers compelled such a result as they betrayed a failure to establish willful and wanton conduct, and further, were based on immunity and legal justification principles. The trial court agreed, finding the answers to the first and second interrogatories controlled the verdict. Strong's estate challenged this determination, while Givens and Dudley challenged the summary judgment motions against them. The trial court denied them relief, and this appeal followed.

¶ 19                                              ANALYSIS

¶ 20  On appeal, Strong's estate maintains that the entire $1,999,998 jury verdict must be reinstated because the City was barred from reducing damages. To address this dispositive matter, we turn first to the underlying allegations. Here, for Strong's estate to prove a claim under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2020)) and the Probate Act of 1975 (755 ILCS 5/27-6 (West 2020)), it was required to prove that the City owed a duty to Strong, the City breached that duty, the breach of the duty was a proximate cause of Strong's injuries or death, and monetary damages resulted to the entitled individuals under the acts. *Bovan v. American Family Life Insurance Co.*, 386 Ill. App. 3d 933, 938 (2008); see also *Messmore v. Silvis Operations, LLC*, 2018 IL App (3d) 170708, ¶¶ 24-25 (noting the differences between wrongful death and survival claims); *Williams v. Manchester*, 228 Ill. 2d 404, 421-22 (2008) (noting that aside from the death occurrence, these elements are the same as for common law negligence).

¶ 21  Because the City would otherwise be immune from liability for negligence, Strong's estate also had to prove that the officers' conduct was willful and wanton, as well as legally unjustified. See 745 ILCS 10/2-202 (West 2020) (noting that under the Local Governmental and Governmental Employees Tort Immunity Act, "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."); *Price v. City of Chicago*, 2018 IL App (1st) 161599, ¶ 29. In response to allegations by Strong's estate, the City filed an affirmative defense alleging that Strong was contributorily willful and wanton, and it was Strong's own conduct that led to his untimely death. Thus, at trial, both parties alleged the other was willful and wanton. We note that "willful and wanton" is not a freestanding, independent tort. See *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 274 (1994). Rather, as a separate claim, willful and wanton conduct is often alleged in conjunction with negligence and can be either intentional or reckless. *Doe v. Coe*, 2019 IL 123521, ¶ 34; *Poole v. City of Rolling Meadows*, 167 Ill. 2d 41, 48-49 (1995). Here, the parties argued both forms to the jury.

¶ 22

¶ 23        The estate now argues that the City failed to assert a proper affirmative defense because, under current supreme court law, the City had to specifically allege that Strong was *contributorily negligent*, rather than willful and wanton. The estate thus argues that the City's contributory fault affirmative defense was not legally cognizable, and a setoff in damages is disallowed where "all the parties are charged with willful and wanton conduct." In particular, the estate maintains "the damages levied against [a] defendant for its willful and wanton conduct can never be shared with another willful and wanton tortfeasor," such as Strong. Consequently, the estate maintains that the reduction in damages due to Strong's contributory fault was erroneous and the special interrogatories were not warranted. For these reasons, the estate asks that we reinstate the entire verdict in its favor.

¶ 24        The City responds that the estate forfeited this issue by failing to raise it below prior to the lengthy jury trial. We agree but nevertheless address the estate's arguments because they impact other contentions raised on appeal and also present an issue of first impression. See *Doe v. Alexian Brothers Behavioral Health Hospital*, 2019 IL App (1st) 180955, ¶ 28 n.4 (noting that forfeiture is a limitation on the parties but not on the court). Since the establishment of Illinois's comparative fault system, our supreme court has not directly decided whether a tort claimant's own reckless willful and wanton conduct precludes him from recovering against a reckless willful and wanton defendant. See Illinois Pattern Jury Instructions, Civil, No. B14.03 (2011), Notes on Use (hereinafter IPI Civil (2011)) (noting, "no Illinois case has yet decided the effect of a plaintiff's contributory willful and wanton conduct"). The estate, in raising its rather convoluted claim that the City's willful and wanton affirmative defense was impermissible, draws on a line of supreme court decisions dating to the 1990s that examine the right to claim personal injury damages in the face of willful and wanton conduct.

¶ 25        In the seminal case, *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429 (1992), our supreme court addressed whether a plaintiff's negligence could be compared to a defendant's willful and wanton conduct, thereby limiting the plaintiff's recovery. There, the plaintiff, Burke, went to 12 Rothchild's Liquor Mart, Inc. (Rothschild's), and entered into an altercation over payment for soda pop. The manager ultimately shoved Burke, at which point he fell from a broken floor tile and struck his head on a steel door panel, immobilizing his arms and legs. *Id.* at 433-34. Police then appeared pursuant to the manager's call, sprayed Burke with an eye-burning substance, and dragged him from the store only to drop him on the sidewalk before throwing him into the police paddy wagon so that his head struck the interior steel wall. *Id.* at 434. Burke became a quadriplegic and sued both Rothschild's and the City of Chicago for negligence. Following a jury trial, the two defendants were found jointly liable. *Id.* at 435. While Burke was determined to be contributorily negligent as to Rothschild's, thereby reducing those damages, the court ruled that Burke's contributory negligence could not be compared with the City's willful and wanton conduct. In other words, the City was not entitled to a setoff for Burke's comparative negligence. *Id.*

¶ 26        The City appealed, arguing the historic rule that "ordinary negligence cannot be compared with willful and wanton conduct" was unfair. *Id.* at 440. The supreme court reviewed the comparative fault statute and tort immunity act then in effect and noted that the act clearly insulated cities "against suits for negligence" and "punitive damages," but would not shield willful and wanton behavior showing a "deliberate intention to cause harm or a complete indifference to the safety of others." *Id.* at 443. From this, *Burke* concluded that the legislature

had not shown an intent to disrupt the historic rule. *Burke* then turned to conflicting case law on the issue, noting willful and wanton was "capable of various interpretations," with some cases treating it as a type of negligence and some treating it as quite distinct. *Id.* at 444-48. Following this, the *Burke* court subscribed to the latter view also expressed in section 500 of the Restatement (Second) of Torts "that there is a qualitative difference between negligence and willful and wanton conduct," since "willful and wanton conduct carries a degree of opprobrium not found in merely negligent behavior." *Id.* at 450-51; Restatement (Second) of Torts § 500 cmt. g (1965). Rather, it carries the degree of moral blame attached to intentional harm. As such, *Burke* reaffirmed the historic rule that a plaintiff's negligence *cannot* be compared with a defendant's willful and wanton conduct.[3]

¶ 27        Notwithstanding its holding, *Burke* did not distinguish the intentional form of willful and wanton conduct from the reckless form, as later cases would. Notably, intent denotes that the actor desires to cause consequences of his act or believes them to be substantially certain to result. Restatement (Second) of Torts § 8A (1965). Recklessness, on the other hand, denotes that the actor failed, after knowledge of impending danger, to exercise ordinary care to prevent it or failed to discover a danger (whether by being reckless or careless) when it could have been discovered with ordinary care. *American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274, 285 (2000). Moreover, *Burke* left "to the future a determination of whether a *plaintiff's willful and wanton conduct* can be compared with the *willful and wanton conduct of the defendant*" (emphases added), which is the scenario that now presents itself to us. *Burke*, 148 Ill. 2d at 452.

¶ 28        On the heels of *Burke*, the supreme court issued a plurality opinion in *Ziarko*, this time addressing contribution between two defendants, rather than a plaintiff's contributory negligence. There, the plaintiff Ronald Ziarko was struck by a Soo Line railroad train. A jury found Soo Line willful and wanton and the subject railroad yard, Milwaukee Motor, negligent. Soo Line sought contribution from Milwaukee Motor, but Milwaukee Motor argued that was impermissible because Soo Line was willful and wanton, *i.e.*, intentional.

¶ 29        *Ziarko* first observed the contribution statute did not abolish the historic rule dating back to English common law that contribution is prohibited "between intentional tortfeasors." *Ziarko*, 161 Ill. 2d at 271; see also *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 204-05 (1989) (finding same). *Ziarko* noted the reasoning that an intentional tortfeasor whose liability arose from his own deliberate wrong should not "be afforded the equitable benefits of shifting a portion of that liability to another tortfeasor under principles of contribution." *Ziarko*, 161 Ill. 2d at 271. That, however, was not the case that presented itself in *Ziarko*, as explained immediately below.

¶ 30        The *Ziarko* plurality clarified that *Burke*'s holding was confined to the form of willful and wanton conduct that was so morally blameworthy it approached intentional harm. *Id.* at 273. Like punitive damages, liability for intentionally willful and wanton conduct aimed to punish bad behavior. Yet, there were instances when willful and wanton conduct was merely intended to compensate plaintiffs for their injuries. *Ziarko* thus recognized a different form of willful and wanton conduct, which was merely reckless. "Under the facts of one case, willful and

---

[3]The court further reasoned that given that punitive damages were prohibited by statute against the City, also disallowing the setoff from a plaintiff's contributory fault might deter municipal defendant's wanton and willful conduct.

wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing." *Id.* at 275-76. Interpreting *Burke* to disallow *any* willful and wanton tortfeasor, even a merely reckless one, to offset his monetary responsibility was contrary to the current comparative fault and contribution principles.

¶ 31    Consequently, *Ziarko* held "a defendant found guilty of willful and wanton conduct may seek contribution from a defendant found guilty of ordinary negligence if the willful and wanton defendant's acts were found to be simply reckless." *Id.* at 280. Because the record in *Ziarko* showed Soo Line's conduct was merely reckless, it could pursue contribution from Milwaukee Motor. Thus, the holding in *Ziarko* was confined to determining whether a reckless defendant could seek reduced damages. The court did not, as the estate maintains, hold that contributory negligence by the plaintiff is a precondition to reduced damages. Instead, the plurality opinion noted that the supreme court had not yet addressed "whether a *plaintiff's willful and wanton acts* should serve as a complete bar, or serve as a damage-reducing factor, in the award of compensatory damages, where the *defendant has also engaged in willful and wanton conduct*." (Emphases added.) *Id.* at 277-78.

¶ 32    A year later, a majority of the court adopted *Ziarko*'s holding in *Poole*, 167 Ill. 2d at 48. There, a police officer investigating an incident accidentally shot the plaintiff Steven Poole, and Poole sued the City and its police officer alleging willful and wanton conduct. *Id.* at 42. A jury awarded Poole compensatory damages but found Poole was also contributorily negligent. *Id.* Extending the analysis in *Ziarko*, the supreme court observed that whether the damage award could be reduced based on Poole's contributory negligence depended on whether the defendants committed intentional or reckless willful and wanton conduct. *Id.* at 48-49. If intentional, there could be no such reduction; if reckless, there could be such a reduction. *Poole* concluded it was unclear which type of willful and wanton conduct the jury found defendants guilty of and reversed and remanded the case for a new trial. *Id.* at 49-50.

¶ 33    The foregoing cases demonstrate several principles at trial regarding a plaintiff's contributory conduct as compared to a defendant's willful and wanton conduct. See IPI Civil (2011) No. 14.01, Notes on Use (noting, absent a plaintiff's contributory fault, "there may be no need for a jury to determine which form of willful and wanton conduct was committed by the defendant"). First, a plaintiff's intentional willful and wanton conduct cannot be compared to a defendant's willful and wanton conduct (whether reckless or intentional), thus serving as a complete bar to the plaintiff's recovery. Second, a plaintiff who is either negligent or recklessly willful and wanton can recover from a defendant who is intentionally willful and wanton, but the damages are *not* then subject to reduction based on comparative fault principles. See *Poole*, 167 Ill. 2d at 48. Third, a plaintiff who is recklessly willful and wanton can recover from a defendant who is recklessly willful and wanton, and if both parties are found to have acted in such a manner, the plaintiff's damages *are* subject to a reduction based on comparative fault principles.

¶ 34    If as under *Ziarko*, a defendant tortfeasor who engages in reckless willful and wanton conduct may seek contribution from another defendant tortfeasor who commits ordinary negligence, surely then a defendant tortfeasor who engages in reckless willful and wanton conduct may have his damages reduced by a plaintiff whose reckless willful and wanton conduct (which is a heightened standard) contributed to his injuries. The estate's contrary view

- 9 -

on appeal[4] would lead to the anomalous result where a plaintiff who is contributorily negligent, or merely careless, would be entitled to less money after the setoff of damages than a plaintiff whose conduct was more egregious, *i.e.*, recklessly willful and wanton.

¶ 35    We note that our conclusion departs from the Restatement insofar as the Restatement prohibits a reckless plaintiff's recovery against a reckless defendant. See Restatement (Second) of Torts § 503(3) (1965) (noting,"[a] plaintiff whose conduct is in reckless disregard of his own safety is barred from recovery against a defendant whose reckless disregard of the plaintiff's safety is a legal cause of the plaintiff's harm"). Our conclusion also departs from several older cases in existence before the modern comparative fault system that arose with *Alvis v. Ribar*, 85 Ill. 2d 1 (1981). Prior case law precluded a negligent plaintiff's recovery against a negligent defendant (but not a negligent plaintiff's recovery against a willful and wanton defendant). *Id.* at 5; *Burke*, 148 Ill. 2d at 441 (noting that "when the defendant's conduct was willful and wanton, the plaintiff's contributory negligence could not be raised as a defense to bar recovery"); see also IPI Civil (2011) No. 14.01, Comment ("Prior to the adoption of comparative negligence, [a] defendant's willful and wanton conduct negated the defense of contributory negligence." (citing *Green v. Keenan*, 10 Ill. App. 2d 53, 60 (1956))). Significantly, case law likewise precluded a willful and wanton plaintiff's recovery against a willful and wanton defendant. See *Zank v. Chicago, Rock Island & Pacific R.R. Co.*, 17 Ill. 2d 473, 476 (1959) (noting, "contributory willful and wanton misconduct of the plaintiff is a defense for a defendant charged with willful and wanton misconduct"). As stated, we believe *Burke* and its progeny changed the course of a willful and wanton plaintiff's recovery.

¶ 36    We also observe that between the decisions entered in *Ziarko* and *Poole*, effective March 9, 1995, the legislature amended Illinois's comparative fault statute, with the stated purpose of allocating tort damages based on the "proportionate fault" of the parties. Pub. Act 89-7, § 15 (eff. Mar. 9, 1995) (amending 735 ILCS 5/2-1116). The statute stated that a plaintiff's "contributory fault" must be compared to that of the other tortfeasors whose "fault" proximately caused "the death, injury, loss, or damage for which recovery is sought." 735 ILCS 5/2-1116(c) (West 1996). This necessarily includes tortfeasors who committed reckless willful and wanton conduct. The statute defined " '[c]ontributory fault' " as "*any fault* on the part of the plaintiff (including but not limited to negligence, assumption of the risk, or *willful and wanton misconduct*) which is a proximate cause of the death, bodily injury to person, or physical damage to property for which recovery is sought." (Emphases added.) *Id.* § 2-1116(b). The statute further defined " '[f]ault' " in relevant part as "any act or omission that (i) is negligent, *willful and wanton*, or *reckless* *** and (ii) is a proximate cause of death, bodily injury to person, or physical damage to property for which recovery is sought." (Emphases added.) *Id.*

¶ 37    Taken as a whole, the statute required the willful and wanton conduct by the plaintiff to be compared with the willful and wanton or reckless acts or omissions of the defendant whose fault was a proximate cause of the death, injury, loss, or damage for which recovery was sought. See *Roberts v. Alexandria Transportation, Inc.*, 2021 IL 126249, ¶ 29 (reading the statute's plain and ordinary language so as to divine its intent). While that statute was later

---

[4]In fact, when discussing jury instructions during the trial, the estate conceded the City was entitled to a setoff to the extent it alleged "recklessness versus recklessness." The estate later repeated this concession.

declared unconstitutional for other reasons, the now defunct amended statute and the legislature's apparent intent to codify the common law confirms our determination: allowing a plaintiff's reckless willful and wanton conduct to reduce its damages against a reckless willful and wanton defendant is consistent with *Burke* and its progeny. See *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369, 381-82 (2008); *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 467 (1997); see also *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 458 (1997) (in amending a statute, the legislature is presumed to have been aware of judicial decisions interpreting the statute and to have acted with this knowledge). Given that the statute did not distinguish between the plaintiff's reckless or intentional willful and wanton conduct, it did not upset the common law rule, established in *Burke* and its progeny, barring recovery or contribution for intentional willful and wanton conduct.

¶ 38    Having established the state of the law, we must reject the estate's argument that *Ziarko* would only permit a reduction in damages for Strong's contributory negligence in this case if the City had alleged ordinary contributory negligence rather than contributory willful and wanton conduct. We also note that willful and wanton conduct is but a heightened form of negligence, and one for which the City did raise as an affirmative defense.

¶ 39    Thus, to the extent the estate argues the affirmative defense was legally or factually inadequate, we disagree. The City alleged and argued that Strong had a duty to refrain from willful and wanton criminal conduct, he breached that duty, and his conduct proximately caused his injuries. See *Hartmann Realtors v. Biffar*, 2014 IL App (5th) 130543, ¶ 20 (noting that an affirmative defense is a pleading which gives color to the opponent's claim but asserts a new matter that defeats the plaintiff's apparent right of recovery); see also *Bell v. Taylor*, 827 F.3d 699, 704-05 (7th Cir. 2016) (an affirmative defense limits or excuses the defendant's liability by asserting facts and arguments that, if true, will defeat the plaintiff's claim, even assuming the allegations in the complaint are true). The City added that this was the case even if the police officers also caused the injuries, given that Strong was more willful and wanton than the officers. The City thus adequately alleged willful and wanton conduct as an aggravated form of negligence that could defeat Strong's cause of action. See *Doe v. Coe*, 2019 IL 123521, ¶ 34.

¶ 40    *Whether Special Interrogatory Nos. 1 and 2 Were in Proper Form*
         *and the Answers Were Consistent With the General Verdict*

¶ 41    Strong's estate next contends the special interrogatories directed at willful and wanton conduct were improper. Special interrogatories are meant to test the validity of a jury's general verdict on one or more issues of ultimate fact. *Brown v. City of Chicago*, 2019 IL App (1st) 181594, ¶ 42; *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 117. Thus, a special interrogatory is in proper form if, as presented in easily understandable terms, it relates to an ultimate issue of fact on which the parties' rights depend and the answer thereto may be inconsistent with the general verdict. *Inman*, 2019 IL App (1st) 172459, ¶ 117. It must consist of a single, direct question that, standing on its own, is dispositive of an issue in the case such that it would, independently, control the verdict. *Id.*

¶ 42    Moreover, courts should find an inconsistency between a special finding and the general verdict *only* when the two are *clearly and absolutely irreconcilable*. *Price*, 2018 IL App (1st) 161599, ¶ 24. If there is a reasonable hypothesis allowing the special finding to be construed consistently with the general verdict, they are not "absolutely irreconcilable," and the special

finding will *not* control. (Internal quotation marks omitted.) *Brown*, 2019 IL App (1st) 181594, ¶ 42. We exercise all reasonable presumptions in favor of the general verdict, and we review the propriety of the special interrogatories, as well as the granting of judgment notwithstanding the jury's verdict, *de novo*. *Id.*

¶ 43    The estate contends special interrogatory Nos. 1 and 2 were improper, as they were "ambiguous, vague and confusing" and neither invited an answer that was absolutely irreconcilable with the $999,999 general verdict. Thus, according to the estate, the interrogatories should not have been given and the jury's answers thereto cannot control the general verdict.[5] The City responds that the special interrogatories properly tested the City's affirmative defense in the face of the general verdict for Strong's estate.

¶ 44    As set forth, the jury in this case returned general verdict form B for Strong's estate and against the City. In accordance with the instructions, the jury had to find that (1) the police shot Strong without legal justification insofar as police reasonably believed such force was necessary to prevent imminent death or great bodily harm or the commission of a forcible felony, among other bases; (2) the police were willful and wanton in shooting Strong insofar as they shot him multiple times, shot at the van he occupied, fired without justification, engaged in contagion fire resulting in his injury, or used force likely to cause great bodily harm; (3) Strong died; and (4) the officers' willful and wanton conduct proximately caused Strong's death. Yet, in returning verdict form B, the jury also found that Strong was willful and wanton insofar as he placed officers in imminent fear of death or great bodily harm to themselves or others, and he was 50% at fault for causing his own death. The court instructed the jury that willful and wanton conduct was "a course of action which is without legal justification and shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for a person's own safety and/or the safety of others." See IPI Civil (2011) No. 14.01.

¶ 45    On the heels of this, the jury was presented with the special interrogatories, which we construe from the perspective of an ordinary person in light of the jury instructions and not on the basis of mere abstract mathematical analysis as an exercise in symbolic logic. *LaPook v. City of Chicago*, 211 Ill. App. 3d 856, 866 (1991). Special interrogatory No. 1 asked, "At the time deadly force was used, did the Chicago Police Officers who used deadly force engage in a course of action without legal justification, which showed *an actual or deliberate intention*

---

[5]The City contends the estate waived its contentions. To avoid waiver of an objection to a special interrogatory, a party must lodge specific objections about the special interrogatory's form at the jury instruction conference. *Price*, 2018 IL App (1st) 161599, ¶ 22; *LaPook v. City of Chicago*, 211 Ill. App. 3d 856, 864-65 (1991). Whether a special interrogatory is inconsistent with the general verdict, however, is not subject to waiver. *LaPook*, 211 Ill. App. 3d at 865 (noting that a plaintiff can be bound only to the issues the jury's special interrogatory actually determines). We proceed on the merits notwithstanding the estate's failure to raise some of its specific objections at the conference as to the form of the special interrogatories. See *Doe v. Alexian Brothers Behavioral Health Hospital*, 2019 IL App (1st) 180955, ¶ 28 n.4 (addressing the improper form of a special interrogatory even though it was not objected to until the posttrial motion and noting that forfeiture is a limitation on the parties but not the on court); see also *Struthers v. Jack Baulos, Inc.*, 52 Ill. App. 3d 823, 826 (1977) (noting that neither the trial court nor a reviewing court is bound by the failure of a party to specifically challenge a special interrogatory). Given this as-yet unclear area of law and in the interest of justice, we exercise discretion to consider the estate's challenge to the special interrogatories.

to harm *David Strong*?" (Emphases added.) Special interrogatory No. 2, which was prefaced the same, asked whether police "showed an *utter indifference or conscious disregard for the safety of others*?" (Emphasis added.) Finally, although the estate does not challenge special interrogatory No. 3, it is worth noting that it asked, "At the time deadly force was used against David Strong, did the Chicago Police Officers who used deadly force reasonably believe that such force was necessary to prevent imminent death or great bodily harm?"

¶ 46    The clear aim of these respective questions was to determine whether the officers engaged in *intentional* willful and wanton conduct or *reckless* willful and wanton conduct and whether deadly force was justified. Yet, the aim fell demonstrably short.

¶ 47    First and foremost, all three special interrogatories were impermissibly compound and therefore not focused on one element dispositive of the claim. See *Simmons v. Garces*, 198 Ill. 2d 541, 563 (2002); *LaPook*, 211 Ill. App. 3d at 865 (noting, a plaintiff is bound only to those issues actually decided by the jury's special interrogatory). As to interrogatory Nos. 1 and 2, they asked whether the use of deadly force by police was unjustified *and* either intentional (interrogatory No. 1) or reckless (interrogatory No. 2). However, the jury could have believed the use of deadly force was justified but either not intentional or not reckless. Likewise, the jury could have believed the use of deadly force was not justified but was either intentional or reckless. There are also two ways to interpret interrogatory No. 3. Either the officers did not believe force was necessary to prevent imminent death or great bodily harm—and, therefore, they were intentionally acting without authority—or the officers believed force was necessary to prevent imminent death or great bodily harm but their belief was not reasonable, and they were therefore reckless. A negative answer to the aforementioned questions would do little to test the general verdict. See *Alexian Brothers Behavioral Health Hospital*, 2019 IL App (1st) 180955, ¶ 32. The form of the special interrogatories, accordingly, was "in direct contradiction to the established rule that a special interrogatory must be phrased as a single, straightforward question." See *Smart v. City of Chicago*, 2013 IL App (1st) 120901, ¶ 37. For this reason alone, the special interrogatories were improper and should be stricken.

¶ 48    Additionally, the interrogatories were vague and confusing. As to interrogatory No. 1, the question was impermissibly narrow in focusing on the officers' intention to "harm David Strong." We agree with the estate that the question would have been more effective if directed at the van's driver and/or occupants rather than focusing solely on Strong. The jury's negative answer to special interrogatory No. 1 could have signified its belief that the officers intentionally shot at the van's driver but only recklessly shot Strong. Indeed, this interpretation would be more consistent with the trial evidence, where police testified that they aimed their shots at the *driver* so as to disable the van and prevent further harm. There was no evidence that police *intended* to shoot Strong in particular. See *Alexian Brothers Behavioral Health Hospital*, 2019 IL App (1st) 180955, ¶ 35 (noting that special interrogatories are to be read in the context of the claims and instructions to determine potential jury interpretations or confusion). In that sense, the negative answer can also be reconciled with the general verdict in favor of Strong but with reduced damages. See *Brown*, 2019 IL App (1st) 181594, ¶ 42.

¶ 49    The estate further argues that interrogatory No. 2 was too broad, insofar as it was directed at "safety of others," and the jury could have concluded that this referenced possible passersby or innocent bystanders rather than the burglars in the van. The evidence would tend to support this interpretation since there was testimony that officers did not know who or what they hit when shooting. As such, the estate maintains the question was ambiguous. The estate maintains

- 13 -

the "ambiguity could have easily resulted in a negative answer," even if the jury believed the officers were acting recklessly towards the van's occupants. The estate contends, and we agree, that the negative answer therefore could be reconciled with the general verdict in its favor.

¶ 50    Because there was a reasonable hypothesis that allowed interrogatory Nos. 1 and 2 to be construed consistently with the general verdict, the interrogatories were not "absolutely irreconcilable" with the general verdict. See *id.* The attempted clarification as to whether the officers' conduct was intentional or reckless failed, and the special interrogatories did not guard the integrity of the general verdict, as required. See *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 112 (2005). For these reasons, the special findings cannot control, and we must reinstate the jury's verdict.

¶ 51    The City nonetheless maintains that *Poole* precludes this result because it is impossible to determine whether Strong's conduct could be compared to that of the officers. In other words, the City maintains there was no factual finding as to whether the officers' conduct was reckless or intentional such that damages may be reduced in accordance with verdict form B.

¶ 52    In *Poole*, discussed above, the jury awarded the plaintiff Poole about $200,000 for his injuries. The trial judge reduced the award by a third due to Poole's contributory negligence, and Poole filed a motion for judgment notwithstanding the verdict, arguing he was entitled to the full jury award of $200,000 because the defendants were willful and wanton under *Burke* (which had not yet distinguished reckless versus intentional willful and wanton conduct). The trial court agreed, but the supreme court reversed. As set forth, after adopting *Ziarko*, the supreme court found it was unclear from the pleadings or jury instructions which type of willful and wanton conduct the jury found defendants guilty of. The court also noted no special interrogatory was submitted on the matter. As such, the court stated it could not determine whether the damages should be reduced by Poole's contributory conduct.[6]

¶ 53    Significantly, *Poole* also cited *Pedrick* for the familiar standard that judgments notwithstanding the verdict must be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand" (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). See *Poole*, 167 Ill. 2d at 50. Thus, viewing the evidence in favor of the defendant-opponents, *Poole* concluded it could not say the evidence so overwhelmingly showed they were intentionally willful and wanton such that the plaintiff's contributory negligence could not be considered in reducing damages.

¶ 54    This case reaches us at a different juncture. Here, the City was the movant seeking judgment notwithstanding the verdict based on the special interrogatories. Yet, overriding a jury's verdict is a drastic step that affects public confidence in the jury system. *Brown*, 2019

---

[6]In reaching this conclusion, we observe that *Poole* suggests, but does not mandate, that a special interrogatory be given to distinguish reckless and intentional willful and wanton conduct. Instead, the pleadings, arguments, evidence, general jury instructions, special interrogatories, or some combination thereof must demonstrate which type of willful and wanton conduct both parties are liable of. See *Poole*, 167 Ill. 2d at 49-50; see also *Ziarko*, 161 Ill. 2d at 282 (permitting contribution between the defendants where the record did not reflect that the jury found one defendant's willful and wanton conduct to have been intentional); IPI Civil (2011) No. 14.01, Notes on Use (noting that there may be a jury finding distinguishing reckless from intentional willful and wanton conduct via the instruction or a special interrogatory).

IL App (1st) 181594, ¶ 58; see also 735 ILCS 5/2-1108 (West 2018) (stating, "[u]nless the nature of the case requires otherwise, the jury shall render a general verdict"). As such, a verdict must be allowed to stand if *any* facts exist allowing the verdict to be harmonized with the jury's special findings, even without knowing a precise basis for the jury's verdict. *Brown*, 2019 IL App (1st) 181594, ¶ 58. "Although the law at present not only allows but requires courts to pose special interrogatories to a jury designed to undermine the often hard-fought consensus that their general verdict represents, courts have a duty to exercise all reasonable presumptions in favor of the jury's verdict." *Id.* That is just what we do now.

¶ 55      Here, as stated, the jury returned verdict form B holding the City liable and also finding Strong contributorily at fault. On this same verdict form, the jury reduced the damages by half (whereas there was no such jury finding in *Poole*). Consistent with the jury verdict, the evidence showed that both Strong and the officers were recklessly willful and wanton in their conduct. See *Mazikoske v. Firestone Tire & Rubber Co.*, 149 Ill. App. 3d 166, 181 (1986) (noting, the resulting general verdict will be sustained if there are one or more good causes of action or counts to support it (citing *Moore v. Jewel Tea Co.*, 46 Ill. 2d 288, 294 (1970))). The police had some knowledge of the impending danger, which was the van exiting the garage. Several officers verbally warned that the van was exiting, and two radio warnings were issued about a minute before the van exited, although very few of the officers heard them. Thus, officers failed to use ordinary care to prevent what was at that point an expected danger, injury to themselves from the van. They likewise could have discovered the danger by merely listening to their radios or better coordinating with one another. When the van did burst through the garage, officers then recklessly fired 76 rounds towards it, apparently without much regard to who they were firing at. Although officers claimed to aim for the driver, they shot all three burglars multiple times. See Restatement (Second) of Torts § 500 cmt. d (1965) (noting that where a person knows or has reason to know that others are in range of his conduct involving serious risk of harm, that is conclusive of recklessness toward them). Officer Papin, who appeared to be the main reason many fired their weapons, also walked away from the scene with minimal injury.

¶ 56      Likewise, the evidence showed that Strong and his cohort knew at various points that police were by the store windows, the garage, and side entry door. As the burglars hopped into the van, police were trying to enter through the side door and yelling at them. Thus, Strong and his cohort were equally reckless in failing to acknowledge the pending danger of striking an officer or bystander when they burst through the garage door, as well as the resistance such actions would inspire in the police.

¶ 57      It is the province of the jury to resolve conflicts in the evidence, pass on the credibility of witnesses, and decide what weight should be given to witnesses' testimony. *Price*, 2018 IL App (1st) 161599, ¶ 40. Given that the evidence in this case supported a finding of recklessness, as well as the aforementioned presumptions, we must reinstate the jury verdict of $999,999. Moreover, viewing the evidence in a light most favorable to the estate as the nonmovant, we cannot say it so overwhelmingly favored the City or, under *Poole*, showed that the officers were intentionally willful and wanton to preclude the jury's reduction of damages in form B. We further note that the City has effectively conceded (albeit in the context of their argument in favor of the special interrogatories) that the officers did not intend to harm Strong. This concession is consonant with the conclusion that police thereby acted in a reckless manner.

- 15 -

¶ 58    We note this result is also consistent with the new iteration of the statute on special interrogatories, section 2-1108 of the Code of Civil Procedure (735 ILCS 5/2-1108 (West 2020)), which applies to trials commencing on or after January 1, 2020. That new version makes the decision of whether to submit a special interrogatory a discretionary matter for the trial judge, rather than one of law garnering *de novo* review. *Cf.* 735 ILCS 5/2-1108 (West 2018). In the event of an inconsistency between the special and general verdict, the judge "shall direct the jury to further consider its answers and verdict." 735 ILCS 5/2-1108 (West 2020). A new trial then becomes a matter of discretion if the jury cannot render a general verdict compatible with any special finding. Finally, it permits the parties during closing "to explain to the jury what may result if the general verdict is inconsistent with any special finding." *Id.*

¶ 59    The amendment clearly shows the legislature's desire to place the general verdict on a pedestal as a trophy that few special interrogatories can knock down. See *Roberts*, 2021 IL 126249, ¶ 29 (reading the statute's plain and ordinary language so as to divine the legislature's intent). In short, the amendment codifies the already existing common law giving ultimate deference to the general verdict. See *Bruso*, 178 Ill. 2d at 458. While this iteration of section 2-1108 did not apply in the present case, tried in May 2019, we find it persuasive authority to support our result. See also *Brown*, 2019 IL App (1st) 181594, ¶ 59 (noting that cases where incompatibility arises serve as "a good illustration of the need for the increased flexibility" that the amendment of section 2-1108 aims to provide).

¶ 60    *Whether the Trial Court Erred in Granting the Summary Judgment*
*Motion Against Givens and Dudley*

¶ 61    We next address the granting of summary judgment against Givens and Dudley under *de novo* review. See *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). Summary judgment is appropriate only when the pleadings, depositions, and admissions, together with affidavits, in the record show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020); *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 8 (2004). We construe the evidence strictly against the movant and liberally in favor of the nonmoving party. *Espinoza*, 165 Ill. 2d at 113. Summary judgment should not be granted unless the right of the moving party is clear and free from doubt. *Horwitz*, 212 Ill. 2d at 8.

¶ 62    As set forth, although Givens, Dudley, and Strong all participated in the events, only Strong's civil suit was permitted to proceed. The claims of Givens and Dudley were dismissed based on collateral estoppel from their criminal convictions. Criminal convictions can have an estoppel effect on civil litigation like the present when three threshold requirements are met. *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 387 (2000); *Enadeghe v. Dahms*, 2017 IL App (1st) 162170, ¶ 12. The issue decided in the criminal case must be identical with that in the civil case, there must have been a judgment on the merits in the criminal case, and the party against whom the estoppel is asserted must have been a party to the prior adjudication. *Savickas*, 193 Ill. 2d at 387; *Enadeghe*, 2017 IL App (1st) 162170, ¶ 12. In addition, no unfairness must result to the party who is estopped from relitigation. *Savickas*, 193 Ill. 2d at 388; *Enadeghe*, 2017 IL App (1st) 162170, ¶ 12. The court, in determining whether estoppel should apply, must balance the need to limit litigation against the right to an adversarial proceeding in which a party is accorded full and fair opportunity to present his case. *Savickas*, 193 Ill. 2d at 388; *Enadeghe*, 2017 IL App (1st) 162170, ¶ 12.

¶ 63    The only dispute before us is the identity of issues. Givens and Dudley maintain there was no identity of issues because the officers' alleged willful and wanton conduct was not litigated in their criminal cases, making collateral estoppel inapplicable. The City takes a different tack and argues the officers' conduct at first blush is irrelevant. The City maintains the criminal cases demonstrated that Givens and Dudley's "own intentional conduct caused their injuries" and precluded any finding that the officers were unjustified in the shooting. As such, the City maintains the two offenders are now barred from civil recovery.

¶ 64    The City, as the party asserting collateral estoppel, bears a heavy burden of demonstrating with clarity and certainty that Givens and Dudley's prior criminal convictions determined identical matters. See *People v. Pawlaczyk*, 189 Ill. 2d 177, 191 (2000); *Peregrine Financial Group, Inc. v. Martinez*, 305 Ill. App. 3d 571, 581 (1999). For collateral estoppel to apply, it must be conclusive that *a fact was so in issue* that it was necessarily decided by the court rendering the prior judgment. *Peregrine*, 305 Ill. App. 3d at 581; see also *Gauger v. Hendle*, 2011 IL App (2d) 100316, ¶ 114 (collateral estoppel is narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment). In that sense, a judgment in the first suit operates as an estoppel *only* as to the point or question actually litigated and determined and not as to other matters that might have been litigated and determined. *Gauger*, 2011 IL App (2d) 100316, ¶ 114.

¶ 65    For the reasons that follow, we reject the City's claim that collateral estoppel applies here. In *Givens*, 2018 IL App (1st) 152031-U, and *Dudley*, 2018 IL App (1st) 152039-U, this court considered the sufficiency of the evidence to sustain the burglars' felony murder and aggravated battery convictions, among other claims. At issue was whether the felony murder statute applies when someone resisting the underlying felony (in this case the police) fired the fatal shots killing the victim (*i.e.*, Strong). In upholding the convictions, we found that liability attaches for *any* death that is a proximate or direct and foreseeable consequence of the defendant's underlying felony. We noted that encountering resistance, even if deadly, when committing a forcible felony like burglary was a direct and foreseeable consequence of the felony. We thus upheld the felony murder convictions of Givens and Dudley because Strong's death was a direct and foreseeable result of the offenders' burglary, notwithstanding that it was the police officers who shot Strong. We also upheld Givens's and Dudley's aggravated battery convictions, rejecting the argument that the conduct was unknowing or reckless. We held the burglars knew there were police outside the garage, and the evidence supported the jury's determination that "it was practically certain" the offenders would hit a police officer, which happened to be Officer Papin, when driving through the garage door. *Givens*, 2018 IL App (1st) 152031-U, ¶ 46; *Dudley*, 2018 IL App (1st) 152039-U, ¶ 23. We also rejected Givens's and Dudley's contentions that the trial court abused its discretion in excluding evidence about the officers' use of force policy.

¶ 66    Several matters distinguish the criminal case.[7] First and foremost, with respect to felony murder, this court *did not* determine whether Givens and Dudley were intentional in murdering Strong. On appeal, we expressly observed that a defendant may be found guilty of felony murder regardless of intent and that the mental state is derived only from the underlying offense

_____

[7]As to Givens's and Dudley's criminal cases, we note that any discrepancies between the civil and criminal trials may be challenged in a postconviction petition. However, we offer no comment on the merits of such a petition.

- 17 -

(here, burglary). *Givens*, 2018 IL App (1st) 152031-U, ¶ 26. At the criminal jury trial, for example, consistent with the jury instructions, the State emphasized in closing arguments that "it is immaterial whether the killing is intentional or accidental," so long as a death occurs in the course of the felony. On appeal we noted that liability automatically attaches under those facts. Thus, it was clear that Givens and Dudley intended to commit burglary by knowingly entering the building absent authority and with intent to commit theft. It was likewise clear that they intended to commit aggravated battery by striking Officer Papin, knowing him to be a police officer.

¶ 67    Yet, the criminal prosecution did not conclusively determine whether, under civil standards, Givens and Dudley were by degrees intentionally or recklessly willful and wanton in bringing about their own injuries in the form of the substantial gunshot wounds. In that sense, this case is distinguishable from *Savickas*, 193 Ill. 2d at 388, where collateral estoppel was found to apply. There, the homeowner's insurance company was absolved from defending or indemnifying Savickas, who previously had been found guilty by a criminal jury of intentional murder. The supreme court noted his mental state was necessary to his conviction and concluded that finding established Savickas " 'intended or expected' " the result of his actions, thus excluding him from coverage by the insurance company. Unlike in *Savickas*, the exact issue was not litigated in this case. The City's argument to the contrary that the criminal jury found the two burglars were intentional tortfeasors, which could foreclose a civil suit, must therefore be rejected.

¶ 68    Similarly, the criminal prosecution did not encompass civil tort law, where more than one person may be to blame for causing an injury. See *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995). While the criminal jury certainly found Strong's death was a direct and foreseeable result of the offenders' burglary, and thus the death was a proximate cause of Givens's and Dudley's unlawful activity, the criminal jury did not also consider whether the officers' actions or omissions directly or immediately caused the injuries. On appeal, we wrote, for example, "[t]he issue here is whether Strong's death was a foreseeable consequence of defendant's burglary, not whether the police *shooting* was foreseeable." (Emphasis omitted and in original.) *Givens*, 2018 IL App (1st) 152031-U, ¶ 34; see also *Dudley*, 2018 IL App (1st) 152039-U, ¶ 27 (same). Indeed, the police potentially could be liable for willful and wanton conduct whether it contributed wholly or partly to Givens's and Dudley's injuries so long as it was *one* of the proximate causes of the injury. See *Leonardi*, 168 Ill. 2d at 92-93 ("A person who is guilty of negligence cannot avoid responsibility merely because another person is guilty of negligence that contributed to the same injury." (Emphasis omitted.)).

¶ 69    Relatedly, the criminal jury did not consider whether the police officers' actions were justified or excessive, since the jury was disallowed from considering that evidence. During the criminal trial, the judge expressly excluded testimony about the general orders of the police department, stating that was better left to a civil case. On appeal, we noted "no evidence otherwise suggested that the police would not shoot under [the] circumstances." *Givens*, 2018 IL App (1st) 152031-U, ¶ 52; *Dudley*, 2018 IL App (1st) 152039-U, ¶ 42. While the defense attorneys for Givens and Dudley argued in closing that the police shooting was reckless, a result of fear, or an overreaction involving excessive force, neither defendant was permitted to fully support his theory of defense or fully litigate the matter because it was irrelevant in the criminal trial. *Cf. Enadeghe*, 2017 IL App (1st) 162170, ¶¶ 15-17 (noting that the defendant's

prior criminal conviction for battery could serve as a basis for civil liability where the defendant had a full and fair opportunity to litigate all relevant issues in his criminal trial).

¶ 70 The focus of the criminal trial thus was on the offenders' conduct, not the officers' duty to respond appropriately to a crime consistent with their training, society's expectations, and the law. In short, the criminal case dealt with whether Givens and Dudley committed crimes against the public. The civil case is designed to deal with whether the public, *i.e.*, the City via its police officers, committed wrongs against Givens and Dudley. For the reasons stated above, the City has not fulfilled its heavy burden of demonstrating with clarity and certainty that Givens and Dudley's prior criminal convictions determined identical matters as would arise in a civil proceeding. We conclude collateral estoppel does not apply to bar their civil suit.

¶ 71 We believe that fairness standards associated with collateral estoppel also dictate this result. See *id.* ¶ 12 (noting, "no unfairness must result to the party who is estopped from relitigation"). It is manifestly unjust to permit Strong's case, brought by his estate, to proceed in the civil context but not the case of Givens and Dudley, where the only distinguishing factor is that Strong died from his injuries while Givens and Dudley lived. Viewing the evidence liberally in favor of Givens and Dudley, as the nonmoving parties, summary judgment for the City should not have been granted. See *In re Estate of Berry*, 277 Ill. App. 3d 1088, 1092 (1996) (noting that summary judgment is a drastic remedy and should only be allowed when the record clearly is devoid of any genuine issue of material fact). On remand, Givens and Dudley will have the opportunity to amend their complaint, which presently alleges only battery, and proceed to trial.

¶ 72 *Trial Errors*

¶ 73 Given our holding and in the interest of judicial economy, we address several issues that are likely to recur on remand. See *Shackelford v. Allstate Fire & Casualty Insurance Co.*, 2017 IL App (1st) 162607, ¶ 10. Plaintiffs argue that the trial court erred in barring testimony from two employees who reviewed this police shooting for the Civilian Office of Police Accountability (COPA).[8] COPA is the civilian oversight agency of the Chicago Police Department and investigates complaints of excessive force or incidents where a person dies or sustains a serious bodily injury as a result of police actions. Here, COPA issued a final report finding the shooting justified, but prior to trial, the estate's counsel noted that an investigator and supervisor from COPA had both recommended the opposite, that the shooting was *not* justified and violated police policy (notably, these employees were subsequently fired). Counsel requested that they be permitted to testify about their findings, but the trial court barred the testimony as irrelevant and distracting.

¶ 74 Plaintiffs maintain these officials should be permitted to testify on remand. The City disagrees and relies on *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 116-17 (2003), holding that evidence of a Chicago bus driver's violation of an internal rule and mandated retraining was inadmissible in a negligence suit. The City also cites another case barring evidence of post-accident remedial measures to impeach or prove prior negligence, but those cases are inapposite. Here, plaintiffs' proposed witnesses are from an independent agency responsible for assessing whether the officers' actions were justified based on misconduct complaints; the evidence does not involve post-remedial measures. Regardless, a

---

[8]COPA replaced the Independent Police Review Authority.

jury may consider an officer's violation of a police department rule, along with other evidence, in reaching a determination about misconduct. See *Hoffman v. Northeast Illinois Regional Commuter R.R. Corp.*, 2017 IL App (1st) 170537, ¶ 47. We see no reason for barring testimony from those who evaluated the shooting, as they were mandated and trained to do, and found the shooting lacked justification, the very heart of the civil case. See *Ford v. Grizzle*, 398 Ill. App. 3d 639, 646 (2010) (noting that evidence is relevant "if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence"). Of course this testimony must be limited to the investigator/supervisor's opinion on the matter and not venture into a discussion of their firing or removal from COPA.

¶ 75        Plaintiffs also contend that the officers "arranged a story that the minivan struck Officer Papin in order to retroactively justify the shooting." To support this theory at trial, the estate pointed to a portion of the surveillance videotape, which has no sound, showing officers some 20 minutes after the shooting talking amongst themselves in a group and gesticulating. Some were pointing at the disabled van. The estate also proposed eliciting testimony from its expert, Dr. Alpert, that officers are disallowed from consulting after a shooting. We have reviewed the tape and agree with the City that this proposed evidence is entirely too speculative to support the theory that officers arranged a cover-up. See *People v. Cloutier*, 156 Ill. 2d 483, 501 (1993) (noting that evidence that is remote, uncertain, or speculative may be rejected on the grounds of relevancy). Regardless, the estate was not precluded from challenging whether the van struck Officer Papin, and this may be done again on remand.

¶ 76        Plaintiffs next contend that the court should not have admitted reconstruction animation videos from several officers' points of view as demonstrative evidence. Trial testimony showed the animations were rendered from 3D laser scans of the scene at 2459 S. Western Avenue, surrounding cameras, and also the surveillance video to accurately recreate the officers' perspectives. The videos thus were admissible to aid the jury's understanding as they were relevant and fair. See *Preston v. Simmons*, 321 Ill. App. 3d 789, 801 (2001); see also *Webb v. Angell*, 155 Ill. App. 3d 848, 861 (1987) (noting the requirements for foundation). Plaintiffs nonetheless complain that the video from Officer Curry's perspective omits Officer Papin "running right across his face" and the videos as a whole inaccurately portray lighting and the van's headlights and show the driver shifting the gear into drive contrary to Dudley's testimony (but consistent with that of the officers). All this goes to the weight of the evidence and not its admissibility. See *Preston*, 321 Ill. App. 3d at 801-02. On remand, the parties will have the opportunity to correct any claimed inaccuracies or to again cross-examine the animator as to them at trial.

¶ 77        Last, plaintiffs contend the trial court incorrectly excluded allegations of willful and wanton conduct as part of the issues instruction. At trial, the estate sought to instruct the jury that police officers were willful and wanton in failing to stand clear of the garage door, placing themselves before a moving van, and failing to heed verbal and radio warnings, as well as using excessive force. This conduct could be construed as a course of action showing indifference or disregard for the officers' own safety, which contributed to the excessive shooting. We agree that on remand, plaintiffs should be permitted to instruct the jury that this evidence supports a finding of reckless willful and wanton conduct by the officers. See *Lounsbury v. Yorro*, 124 Ill. App. 3d 745, 751 (1984) (noting, a court must instruct the jury on

all issues reasonably presented by the evidence).

¶ 78                                   CONCLUSION

¶ 79          Based on the foregoing, we reinstate the jury's verdict in favor of Strong's estate for
$999,999. We therefore reverse the trial court's judgment notwithstanding the verdict. We also
reverse the trial court's granting of summary judgment against Givens and Dudley and remand
the case for proceedings consistent with this opinion.

¶ 80          Reversed and remanded.