**2023 IL 127837**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127837)

JOHN W. GIVENS *et al.*, Appellees, v. THE CITY OF CHICAGO, Appellant.

*Opinion filed October 19, 2023.*

_____

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Rochford and O'Brien concurred in the judgment and opinion.

Justice Cunningham concurred in part and dissented in part, with opinion, joined by Justices Neville and Holder White.

_____

**OPINION**

¶ 1     After John W. Givens, Leland Dudley, and David Strong burglarized an electronics store in 2012, they attempted to escape by backing a van out of a closed garage door, striking a police officer in the process. Chicago police officers fired their weapons at the van, resulting in Strong's death and injuries to Dudley and

Givens. Dudley and Givens were thereafter charged, convicted, and sentenced for felony murder (720 ILCS 5/9-1(a)(3) (West 2012)), aggravated battery to a peace officer (*id.* § 12-3.05(d)(4)), and possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2012)). Subsequently, they and Strong's estate filed a civil lawsuit in the circuit court of Cook County against defendant, the City of Chicago (City), alleging the use of excessive force.

¶ 2    With respect to Dudley and Givens, the circuit court entered summary judgment for the City based on the collateral estoppel effect of their prior criminal proceedings. The estate's lawsuit proceeded to a jury trial, which resulted in a partial verdict for the estate. However, the circuit court granted the City's motion for judgment notwithstanding the verdict based on the jury's answers to special interrogatories.

¶ 3    On appeal, the appellate court reversed the circuit court's rulings on both issues, holding that (1) collateral estoppel did not apply to bar Dudley and Givens from litigating their excessive force claims and (2) the circuit court erred in vacating the jury's verdict for the estate. 2021 IL App (1st) 192434. We allowed the City's petition for leave to appeal. For the following reasons, we affirm in part and reverse in part the appellate court's judgment.

¶ 4                                  I. BACKGROUND

¶ 5    In the early morning hours of April 30, 2012, Givens, Dudley, and Strong burglarized Mike's Electronics, a store selling car alarms and audio equipment located at 2459 South Western Avenue in Chicago. The store consisted of a showroom and attached garage on the first floor of the building. The three offenders entered the store through a window by breaking open a metal grate. An occupant of the second-floor apartment heard noises and notified the police. Multiple police officers arrived at the scene while Dudley, Givens, and Strong were still inside the store. Meanwhile, the three offenders took merchandise from the showroom into the attached garage and loaded it into a van that belonged to the store's owner. They then got into the van, put it in reverse, and broke through the closed garage door. Dudley was in the driver's seat, Strong was in the front passenger seat, and Givens was in the back seat. As the van exited the garage at a high rate of speed, it struck Chicago police officer Michael Papin on his left hip before hitting two other

vehicles. Eight police officers shot their weapons at the van, firing approximately 75 bullets at the van and its occupants. Strong died at the scene. Givens and Dudley sustained severe injuries and were later charged criminally.

¶ 6        After being tried jointly by a criminal jury, Dudley and Givens were convicted of first degree felony murder predicated on a forcible felony (720 ILCS 5/9-1(a)(3) (West 2012)), aggravated battery to a peace officer (*id.* § 12-3.05(d)(4)), burglary (*id.* § 19-1(a)), and possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2012)). *People v. Dudley*, 2018 IL App (1st) 152039-U, ¶ 2; *People v. Givens*, 2018 IL App (1st) 152031-U, ¶ 2. Givens was convicted of aggravated battery to a peace officer based on an accountability theory for Dudley's actions. *Givens*, 2018 IL App (1st) 152031-U, ¶ 13. Merging the burglary conviction into the felony murder conviction, the circuit court sentenced Givens to consecutive prison terms of 20 years for felony murder, 6 years for aggravated battery, and 6 years for possession of a stolen motor vehicle. *Id.* ¶ 2. Merging Dudley's burglary conviction into his felony murder conviction, the circuit court sentenced Dudley to consecutive prison terms of 25 years for felony murder, 6 years for aggravated battery, and 6 years for possession of a stolen motor vehicle. *Dudley*, 2018 IL App (1st) 152039-U, ¶ 2. Their convictions and sentences were affirmed on appeal. *Id.* ¶ 48; *Givens*, 2018 IL App (1st) 152031-U, ¶ 61.

¶ 7                          A. Dudley's and Givens's Criminal Appeals

¶ 8        In *Dudley*, 2018 IL App (1st) 152039-U, ¶ 18, the appellate court noted that, in the felony murder context, courts in Illinois adhere to the proximate cause theory of liability (*People v. Hudson*, 222 Ill. 2d 392, 401 (2006); *People v. Lowery*, 178 Ill. 2d 462, 465 (1997)), wherein liability attaches for any death proximately resulting from an offender's unlawful activity. The appellate court found it undisputed that Dudley committed burglary, a forcible felony under Illinois law (720 ILCS 5/2-8 (West 2012)). *Dudley*, 2018 IL App (1st) 152039-U, ¶ 20. The appellate court held that Strong's death occurred during Dudley's burglary commission because Strong was shot during the offenders' attempt to escape from the police. *Id.* The appellate court further held that "Strong would not have been killed had [Dudley] not carried out that burglary." *Id.* In rejecting Dudley's argument that he was not liable because Strong's death was directly attributable to

the police shooting, the appellate court noted that "the purpose of the felony murder statute would be defeated if resistance, even in the form of deadly force, could be considered a sufficient intervening circumstance to terminate a [criminal] defendant's liability for felony murder." *Id.* ¶ 21.

¶ 9        The appellate court further rejected Dudley's claim that Strong's death was not a foreseeable consequence of his burglary offense because he was unaware that the police were outside the store and, given that Dudley and his cooffenders were unarmed, it was not reasonably foreseeable that the police would use deadly force in shooting at the van. *Id.* ¶ 22. The appellate court stated:

"First, [Sergio] Hernandez [(who occupied the second-floor apartment)] testified that the police continuously announced their presence after they arrived. More notably, the video footage showed that lights flashed inside the showroom and the garage, and in both instances, at least one of the offenders hid. Finally, before [Dudley] drove the van through the garage door, Officers Lopez and Gonzalez broke a hole through the interior door to the garage, and continuously yelled 'Chicago police officers, come out, you're surrounded, just come out.' Thus, [Dudley] had reason to know that once he drove the van through the garage door, a police officer would be in the vehicle's path. Moreover, [Dudley] disregards that the van, itself, was a deadly weapon, inviting the police to resist its force with their own deadly weapons." *Id.*

The appellate court "categorically reject[ed] [Dudley's] vacuous contention that no reasonable person could have foreseen that, in reversing a van through a locked garage door during a burglary commission, he would be met with police resistance using deadly force." *Id.* ¶ 23. The appellate court concluded that Dudley's felony murder conviction furthered the purpose of the felony murder statute because he committed a forcible felony and Strong was killed as a result of the violence accompanying that felony (720 ILCS 5/9-1(a)(3) (West 2012) (person who kills another without lawful justification commits first degree murder if, in performing acts which cause the death, he is committing a forcible felony other than second degree murder)). *Dudley*, 2018 IL App (1st) 152039-U, ¶ 24; see also *Givens*, 2018 IL App (1st) 152031-U, ¶ 30.

¶ 10        The appellate court further addressed whether the circuit court abused its discretion in excluding evidence of a general order of the Chicago Police

Department. *Dudley*, 2018 IL App (1st) 142039-U, ¶ 25. The general order provided that, when confronted by an oncoming vehicle, officers are authorized to fire at it to prevent death or great bodily harm to themselves or others but, if it is known that the vehicle is the only force being used, officers should move out of the vehicle's path. *Id.* The appellate court held that the issue before it involved whether Strong's death was a foreseeable consequence of Dudley's burglary offense, not whether the police shooting was reasonably foreseeable to Dudley. *Id.* ¶ 27; see also *Givens*, 2018 IL App (1st) 152031, ¶ 34.

¶ 11　　In *Dudley*, the appellate court further held that the evidence at trial was sufficient to establish that Dudley knowingly caused bodily harm to Officer Papin. *Dudley*, 2018 IL App (1st) 152039-U, ¶ 30; see 720 ILCS 5/12-3.05(d)(4) (West 2012) (a person commits aggravated battery when, in committing a battery, he knows the individual battered to be a peace officer); 720 ILCS 5/12-3 (West 2012) (a person commits battery if he knowingly without legal justification causes bodily harm to an individual or makes physical contact of an insulting or provoking nature with an individual). The appellate court stated:

　　"In his brief, [Dudley] states that '[a]lthough the [surveillance] video indicates that one of the men saw someone outside the storefront, there is no indication that the men knew the *extent* of the police presence outside the garage.' (Emphasis added.) Thus, [Dudley] apparently concedes that he and/or his co-offenders were aware of some police presence outside the store and the garage. Notwithstanding, the surveillance videos also showed that [Dudley, Givens,] or Strong hid after lights flashed inside the garage. This also supports the jury's apparent finding that [Dudley] was aware that the police were outside the garage. Furthermore, as stated, Officers [Daniel] Lopez and [Manuel] Gonzalez broke a hole through the interior door to the garage, while continuously announcing that [Dudley] and his co-offenders were surrounded by the police. This, alone, supports the jury's apparent finding that [Dudley] was aware that the police were outside the garage before he drove the van through it. Given the foregoing, the evidence supported the jury's determination that [Dudley] was aware that, in driving through the garage door, it was practically certain that a police officer would be hit." (Emphasis omitted.) *Dudley*, 2018 IL App (1st) 152039-U, ¶ 33.

See also *Givens*, 2018 Il App (1st) 152031-U, ¶ 45.

¶ 12       On appeal, Givens likewise argued, *inter alia*, that Strong's death was an unforeseeable consequence of the burglary. *Given*s, 2018 IL App (1st) 152031-U, ¶ 3. The appellate court held that Givens "committed a forcible felony and Strong was killed as a result of the violence accompanying that felony." *Id.* ¶ 28. The appellate court thus concluded that the evidence was sufficient to sustain Givens's felony murder conviction. *Id.* ¶ 30.

¶ 13       The appellate court noted that Givens did not dispute his involvement with his cooffenders but argued that his aggravated battery conviction should be reversed because the State failed to prove that Dudley, as the principal under the accountability theory for which Givens was tried, knowingly caused bodily harm to Officer Papin. *Id.* ¶ 42. The appellate court concluded that "the evidence support[ed] the jury's determination that [Dudley] was aware it was practically certain he would hit a police officer in driving through the garage door." *Id.* ¶ 45.

¶ 14                              B. Civil Action Below

¶ 15       On November 1, 2016, Givens and Dudley, as well as Theresa Daniel,[1] as special administrator of Strong's estate, filed a three-count complaint in the circuit court of Cook County against the City. Count I alleged battery to Givens and Dudley. Counts II and III alleged causes of action for survival and wrongful death, respectively, by the estate. All three counts alleged the police officers committed battery against the plaintiffs in that they (1) "used excessive force in executing an arrest," (2) "used force likely to cause great bodily harm or death when they were not responding to or in fear of force likely to cause great bodily harm to them," and (3) "fired in excess of 70 bullets towards Givens, Dudley and Strong, when the officers had no justification for the use of deadly force."

¶ 16       In response to the complaint, the City filed an answer and 10 affirmative defenses. These included various provisions of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2012)), as well as self-defense and collateral estoppel. The City also alleged as an

---

[1]Bernice Strong was the original named plaintiff and special administrator of Strong's estate. Theresa Daniel was later substituted as the named plaintiff.

affirmative defense Strong's contributory willful and wanton conduct in engaging or participating in conduct that placed police officers in imminent fear of death or great bodily harm to themselves or others.

¶ 17     Thereafter, the City also filed a motion for summary judgment based on collateral estoppel. The exhibits attached to the motion included the transcript and jury instructions from Dudley's and Givens's joint criminal trial. In its motion, the City asserted that plaintiffs were estopped from litigating certain issues resolved during the criminal proceedings because those proceedings resulted in a final judgment on the merits and involved the same parties.[2] The City identified two issues that it alleged were conclusively determined in the criminal proceedings. First, the City alleged that plaintiffs could not relitigate the jury's finding that the police shooting that caused their injuries did not constitute an excessive use of force that became an intervening cause of Strong's death. Second, the City alleged that plaintiffs could not relitigate the jury's finding that their injuries were proximately caused by their own intentional actions. On the second issue, the City asserted it was entitled to summary judgment based on the theory that a plaintiff whose intentional misconduct proximately causes his or her own injuries cannot recover against other alleged tortfeasors. See, *e.g.*, *Poole v. City of Rolling Meadows*, 167 Ill. 2d 41, 48 (1995) (a jury is "precluded from reducing a defendant's damages by a plaintiff's contributory negligence if the defendant's willful and wanton misconduct was intentional"); *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 280 (1994) ("contribution should not be authorized where the defendant's willful and wanton acts amount to intentional behavior"). Noting that *Poole* and *Ziarko* dealt with the issue of contributory fault, the City argued that "the principles are the same: persons who engage in intentional misconduct which causes injury are not permitted to blame others for also contributing to cause the same injury."

¶ 18     Pursuant to the doctrine of collateral estoppel, the circuit court entered summary judgment against Dudley and Givens, finding their criminal trial precluded their civil action against the City but denied the City's request for summary judgment against the estate. On the same date, the estate was permitted to file a first amended complaint to allege causes of action for wrongful death and survival based on the

---

[2]Although Strong was not subject to criminal proceedings, the City argued that his estate was in privity with the other plaintiffs and, thus, was subject to collateral estoppel, because Strong participated in the same criminal conduct that led to the police shooting.

City's willful and wanton misconduct. Specifically, the estate alleged that the City "acted willfully and wantonly" and "without justification" in, *inter alia*, shooting Strong, shooting at the van occupied by Strong, firing weapons without justification, engaging in "contagion fire" that resulted in injury to Strong, and using force likely to cause great bodily harm or death.

¶ 19    The City and the estate proceeded to a jury trial on the estate's claims. At trial, several surveillance camera videos and police dashcam videos were admitted into evidence and played for the jury. The evidence showed that 19 police officers responded to the scene of the burglary while the burglars were still inside the building. Several police officers shined flashlights into the windows and announced their presence. One police officer attempted to open the garage door but was unable to do so. Police officers Jonathan Michel and Jeremy Lorenz were looking into the windows of the store when they saw the headlights of a vehicle turn on. Officer Lorenz then radioed a message to a police dispatcher at the City's office of emergency management and communications, which stated, "Keep clear. They might be busting out the door." The dispatcher repeated the message to the entire radio zone, which would have been broadcast to every police officer at the scene. However, several police officers testified at trial that they did not hear the message.

¶ 20    Officer Adrian Valdez testified that he saw the headlights turn on in the garage and approached Officer Papin, who was standing in front of the garage door. Valdez testified that he told Papin to "watch out, they're coming out." In a later interview, Valdez told an investigator that he told Papin, "to move out of the way. He's coming." Seconds later, the van crashed through the garage door. The video showed Papin swerving out of the way of the van and moving to the side. As the van continued reversing, eight police officers fired at the van approximately 75 times until it came to a stop. The police officers who shot the van told investigators that they thought the van hit Papin and dragged him under it. The videos showed that seven of the eight police officers who shot at the vehicle were standing on the opposite side of the van from Papin and their line of sight was blocked by the van. The police officers also reported that the van reversed direction and began moving forward after it hit a parked vehicle.

¶ 21    Geoffrey Alpert testified for the estate as an expert on police procedures. During Alpert's testimony, the estate introduced into evidence the Chicago Police

Department's general order and guideline on the use of deadly force, which was in effect on the date of this incident. Alpert opined that the shooting was excessive, unreasonable, and unwarranted and that the police officers who fired were willful, wanton, and reckless and had no legal justification for firing on the van. He testified that the videos showed that Officer Papin was not run over or dragged by the van and that one of the police officers who shot at the van could see Officer Papin move out of the way. In Alpert's opinion, at the time the police officers began shooting, any danger to the officers had passed because the van was out of the officers' way. He opined that some of the police officers engaged in contagion fire, which he defined as shooting because other police officers are shooting while being unaware of the justification for the shooting. Alpert further testified that the video showed that the van did not move forward after stopping; rather, it ricocheted off another vehicle then came to a stop because its tires were deflated.

¶ 22    The City's expert witness, Roy G. Taylor, testified that Illinois law allows deadly force after a forcible felony where injury or the likelihood of injury is prevalent. Taylor opined that deadly force was justified in this case because the offenders knew police were outside the garage yet still used the van as a deadly weapon to effect their escape after committing the forcible felony of burglary. He also opined that the police officers' reasonable belief that Officer Papin had been struck by the van justified the use of deadly force.

¶ 23    Prior to the conclusion of closing arguments, the circuit court and the parties participated in multiple jury instruction conferences. At the third jury instruction conference prior to closing arguments, the estate confirmed that it was submitting two separate theories to the jury regarding the City's willful and wanton conduct: (1) the City was recklessly willful and wanton and (2) the City was intentionally willful and wanton, and thus, the jury would need instruction on both. In doing so, the estate acknowledged that submitting a special interrogatory would be appropriate to clarify the contribution at issue. See *Ziarko*, 161 Ill. 2d at 280 ("[C]ontribution should not be authorized where the defendant's willful and wanton acts amount to intentional behavior.").

¶ 24    Accordingly, the circuit court clarified at this jury instruction conference that, if the jury found against the City and in favor of the estate, it must do so based on (1) the City's intentional willful and wanton conduct, which would allow the estate

to recover damages fully, or (2) the City's reckless willful and wanton conduct, which would allow the estate to recover damages with a deduction for Strong's contributory willful and wanton conduct. See *id.* Thus, the circuit court noted that, for example, verdict form A, allowing no reduction of damages, essentially encompassed a verdict finding the City's conduct intentionally willful and wanton.

¶ 25     With this concern at issue, *i.e.*, to properly instruct the jury regarding the two willful and wanton theories alleged by the City, the circuit court drafted and presented special interrogatories to the parties. The circuit court noted the unique facts of the case, including that Strong was not the vehicle's driver who, testimony revealed, was the target of the shooting, and that considerations of willful and wanton conduct applied both to the City and Strong. The circuit court proposed three special interrogatories and specifically noted that special interrogatory No. 1 would test verdict form A, special interrogatory No. 2 would test verdict form B, and special interrogatory No. 3 would test verdict form C.

¶ 26     As noted, verdict form A provided for a finding in favor of the estate and against the City and assessed damages without regard to Strong's contributory conduct. Verdict form B provided for a verdict for the estate but allowed a reduction of damages based on Strong's contributory fault, and verdict form C provided for a finding in favor of the City and against the estate.

¶ 27     In proposing the special interrogatories, the circuit court requested input or alternatives to the special interrogatories, and the estate offered none. The estate suggested that the special interrogatories be "apportioned somewhere on the verdict form" to avoid "setting this verdict form up for failure." However, the estate did not assert that the special interrogatories, particularly special interrogatory No. 2, consisted of vague, confusing, or impermissibly compound language. Instead, at this jury instruction conference, the circuit court explained, and the estate acknowledged, that if, for example, the jury returned verdict form A, with no reduction of damages, the answer to corresponding special interrogatory No. 1 would control because the jury must find the City's conduct intentionally willful and wanton in entering a verdict pursuant to verdict form A. Likewise, the circuit court clarified that, if the jury returned verdict form B and reduced damages pursuant to Strong's contributory fault, the verdict could stand only if the jury found the City's conduct recklessly willful and wanton.

¶ 28        Thus, the circuit court determined that it would give the jury three special interrogatories in addition to the jury instructions. The special interrogatories stated as follows:

Special interrogatory No. 1: "At the time deadly force was used, did the Chicago Police Officers who used deadly force engage in a course of action without legal justification, which showed an actual or deliberate intention to harm David Strong?"

Special interrogatory No. 2: "At the time deadly force was used, did the Chicago Police Officers who used deadly force engage in a course of action without legal justification, which showed an utter indifference or conscious disregard for the safety of others?"

Special interrogatory No. 3: "At the time deadly force was used against David Strong, did the Chicago Police Officers who used deadly force reasonably believe that such force was necessary to prevent imminent death or great bodily harm?"

¶ 29        During closing arguments, the estate argued that willful and wanton conduct was "an actual or deliberate intent to harm, or if not intentional, *** an utter indifference or conscious disregard for a person's own safety." The estate's closing continued:

"You're going to be asked to answer questions. Did they engage in actual or deliberate intent to harm? Shooting that many bullets without a reasonable belief, there's no question. Police don't shoot their guns unless they are intending to kill. There was an actual intent to harm. But if it wasn't intentional, certainly *** there was a conscious disregard for Mr. Strong's safety that caused his injury. ***

One of the questions you will be asked to answer is if they showed an utter indifference or conscious disregard for the safety of others. The answer to that is yes. You'll be asked a similar question, but this one talks about actual or deliberate intent to harm. The answer to that is yes."

¶ 30 Likewise, the City highlighted the special interrogatories' focus on the difference between intentional and reckless willful and wanton conduct. During closing arguments, the City stated:

"The first interrogatory asks if the Chicago police officers who used deadly force *** engage[d] in a course of action without legal justification which showed an actual or deliberate intention to harm David Strong? There's no evidence of that. There is no evidence that any of these officers acted with a deliberate intention to harm David Strong. Your answer to this first interrogatory should be no.

The second interrogatory you'll be asked to answer: At the time deadly force was used, did the Chicago police officers who used deadly force engage in a course of action without legal justification which showed an utter indifference or conscious disregard for the safety of others? Your answer should be no. There is no evidence that any of these officers acted with an utter indifference or conscious disregard for David Strong."

¶ 31 Prior to the City's closing argument, outside the presence of the jury, the circuit court acknowledged again to the parties that the jury would be instructed that, if Strong's contributory willful and wanton conduct was 50% or less, the estate may recover a reduced proportion considering Strong's willful and wanton conduct. See Illinois Pattern Jury Instructions, Civil, No. 14.03 (2011) (hereinafter IPI Civil). However, the circuit court questioned as follows:

"What's not in here is if they find that the police officers acted intentionally then they would have no occasion to consider the willful and wanton conduct of [Strong]."

The estate replied, "I think it would just theoretically be controlled by the special interrogatory."

¶ 32 Accordingly, the jury was tasked with considering whether Strong's actions amounted to contributory willful and wanton conduct, and if so, by how much; whether the City's actions, through its officers, amounted to willful and wanton conduct; and whether, if willful and wanton, the officers' actions were intentionally willful and wanton or recklessly willful and wanton.

- 12 -

¶ 33    Following the presentation of evidence and closing arguments, the circuit court provided the jury the following instruction on the definition of willful and wanton conduct:

> "When I use the expression 'willful and wanton conduct' I mean a course of action which is without legal justification and shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for a person's own safety and or the safety of others."[3]

The circuit court instructed the jury that "[i]t was the duty of the [City] before and at the time of the occurrence, to refrain from willful and wanton conduct which would endanger the safety of the decedent."

¶ 34    The jury also received the following instruction:

> "It was the duty of the plaintiff's decedent David Strong, before and at the time of the occurrence, to refrain from willful and wanton conduct that would endanger his person. A plaintiff is contributorily willful and wanton if (1) his conduct is willful and wanton, and (2) such willful and wanton conduct is a proximate cause of the alleged injury or death.
>
> The plaintiff's decedent's contributory willful and wanton conduct, if any, which is 50% or less of the total proximate cause of the injury or damages for which recovery is sought, does not bar his recovery. However, the total amount of damages to which he would otherwise be entitled is reduced in proportion to the amount of his willful and wanton conduct. This is known as comparative fault.
>
> If the [estate's] decedent's contributory willful and wanton conduct is more than 50% of the total proximate cause of the injury or damages for which recovery is sought, it bars [the estate's] recovery and your verdict shall be for the [City]."

---

[3]The model instruction provides, "When I use the expression 'willful and wanton conduct' I mean a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for a person's own safety and the safety of others." IPI Civil, No. 14.01.

¶ 35 The circuit court provided the jury with the three verdict forms and instructed the jury with respect to the verdict forms as follows:

"If you find for [the estate] and against [the City] and if you further find that David Strong was not contributorily willful and wanton, then you should use Verdict Form A.

If you find for [the estate] and against [the City] and if you further find that David Strong's injury was proximately caused by a combination of [the City's] willful and wanton conduct and David Strong's contributory willful and wanton conduct and that David Strong's contributory willful and wanton conduct was 50% or less of the total proximate cause of the injury or damage for which recovery is sought, then you should use Verdict Form B.

If you find for [the City] and against [the estate] or if you find that David Strong's contributory willful and wanton conduct was more than 50% of the total proximate cause of the injury or damage for which recovery is sought, then you should use Verdict Form C."

¶ 36 After hearing evidence and closing arguments, the jury rendered its verdict pursuant to verdict form B. The jury found the total amount of damages suffered by the estate equaled $1,999,998, determined that Strong's death was proximately caused by a combination of the City's willful and wanton conduct and Strong's contributory willful and wanton conduct, calculated that Strong was 50% at fault and the City was 50% at fault, and reduced the estate's total damages accordingly.

¶ 37 In addition, the jury answered "No" to all three special interrogatories. Following the verdict, the City moved for judgment on the special interrogatories, arguing that the jury's negative answers to the special interrogatories invalidated the damage award to the estate. The circuit court agreed with the City and determined that the jury's answers to the interrogatories controlled the verdict. Accordingly, the circuit court granted the City's motion and entered judgment notwithstanding the verdict for the City, thus nullifying the $999,999 judgment for the estate.

¶ 38                          C. Appellate Court Decision Below

- 14 -

¶ 39　　On appeal, Givens and Dudley challenged the circuit court's entry of summary judgment against them, and the estate challenged the circuit court's entry of judgment notwithstanding the verdict. The appellate court reversed the entry of summary judgment and remanded the case for trial as to Givens and Dudley. 2021 IL App (1st) 192434, ¶ 79. The appellate court also reversed the judgment for the City based on the special interrogatories and reinstated the $999,999 verdict for Strong's estate. *Id.*

¶ 40　　With respect to Givens's and Dudley's claims, the appellate court held that collateral estoppel did not apply to bar them because there was no identity of issues between the criminal case and the civil case. *Id.* ¶¶ 66-70. The appellate court explained:

> "[T]he criminal prosecution did not conclusively determine whether, under civil standards, Givens and Dudley were by degrees intentionally or recklessly willful and wanton in bringing about their own injuries in the form of the substantial gunshot wounds. ***
>
> Similarly, the criminal prosecution did not encompass civil tort law, where more than one person may be to blame for causing an injury. [Citation.] While the criminal jury certainly found Strong's death was a direct and foreseeable result of the offenders' burglary, and thus the death was a proximate cause of Givens's and Dudley's unlawful activity, the criminal jury did not also consider whether the officers' actions or omissions directly or immediately caused the injuries. *** Indeed, the police potentially could be liable for willful and wanton conduct whether it contributed wholly or partly to Givens's and Dudley's injuries so long as it was *one* of the proximate causes of the injury. [Citation.]
>
> Relatedly, the criminal jury did not consider whether the police officers' actions were justified or excessive since the jury was disallowed from considering that evidence. *** While the defense attorneys for Givens and Dudley argued in closing that the police shooting was reckless, a result of fear, or an overreaction involving excessive force, neither [Dudley nor Givens] was permitted to fully support his theory of defense or fully litigate the matter because it was irrelevant in the criminal trial. [Citation.]

The focus of the criminal trial thus was on the offenders' conduct, not the officers' duty to respond appropriately to a crime consistent with their training, society's expectations, and the law. In short, the criminal case dealt with whether Givens and Dudley committed crimes against the public. The civil case is designed to deal with whether the public, *i.e.*, the City via its police officers, committed wrongs against Givens and Dudley." (Emphasis in original.) *Id.* ¶¶ 67-70.

¶ 41 With respect to the circuit court's entry of judgment notwithstanding the verdict in the estate's case, the appellate court held that, because the special interrogatories were "impermissibly compound," "too broad," and "vague and confusing," they were not absolutely irreconcilable with the verdict. *Id.* ¶¶ 47-50. The appellate court held that the negative answer in special interrogatory No. 2 could be reconciled with the jury's verdict because the jury could have concluded that special interrogatory No. 2's reference to the " 'safety of others' " was referencing possible passersby or innocent bystanders, rather than the burglars in the van. *Id.* ¶ 49. Accordingly, the appellate court reinstated the jury's verdict in favor of the estate. *Id.* ¶ 50.

¶ 42 Thereafter, this court allowed the City's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 43 II. ANALYSIS

¶ 44 On appeal to this court, the City argues that (1) Givens's and Dudley's civil claims are barred by collateral estoppel and (2) the City is entitled to judgment notwithstanding the verdict in the estate's case because the jury's answers to the special interrogatories were inconsistent with the general verdict.

¶ 45 A. Collateral Estoppel

¶ 46 The circuit court resolved Givens's and Dudley's civil lawsuit by granting summary judgment for the City based on collateral estoppel. Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

- 16 -

the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). Resolving a lawsuit though summary judgment is a "drastic measure." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. The circuit court must construe the record strictly against the movant and liberally in favor of the nonmovant and should only grant the motion if the movant's right to judgment is clear and free from doubt. *Id.* This court reviews *de novo* the circuit court's entry of summary judgment. *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Casualty Co.*, 2014 IL 116389, ¶ 12.

¶ 47        "Collateral estoppel is an equitable doctrine, the application of which precludes a party from relitigating an issue decided in a prior proceeding." *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 387 (2000). The collateral estoppel doctrine, also referred to as estoppel by verdict, bars a party from relitigating some controlling fact or question material to the determination of both cases that has been adjudicated against that party in the prior case. *Housing Authority for La Salle County v. Young Men's Christian Ass'n of Ottawa*, 101 Ill. 2d 246, 252 (1984). Collateral estoppel applies to both findings of fact and determinations of law. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 78-79 (2001).

¶ 48        "It is generally accepted that a criminal conviction collaterally estops a defendant from contesting in a subsequent civil proceeding the facts established and the issues decided in the criminal proceeding. See 50 C.J.S. *Judgments* § 922 (1997)." *Talarico v. Dunlap*, 177 Ill. 2d 185, 193 (1997). Nevertheless, the party asserting collateral estoppel must establish that (1) an issue decided in a prior adjudication is identical with the one presented in the current litigation, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. *Savickas*, 193 Ill. 2d at 387. Even when the threshold requirements of collateral estoppel are met, however, the court may decline to apply the doctrine if it would result in unfairness to the party sought to be estopped. *Id.* at 388. The court, in determining whether estoppel should apply, must balance the need to limit litigation against the right to an adversarial proceeding in which a party is accorded a full and fair opportunity to present his case. *Id.* The applicability of collateral estoppel is a question of law subject to *de novo* review. *In re A.W.*, 231 Ill. 2d 92, 99 (2008).

¶ 49 In this case, the parties do not dispute that the second and third collateral estoppel requirements have been established. Givens's and Dudley's criminal cases resulted in final judgments on the merits, and the parties against whom estoppel is asserted are the same parties to the prior adjudication. At issue is the first collateral estoppel requirement—whether issues decided in the criminal case are identical to issues raised in Givens's and Dudley's civil lawsuit.

¶ 50 The identity of issues analysis encompasses the following principles. The party asserting collateral estoppel bears the burden of showing "with 'clarity and certainty' that the identical question was decided in an earlier proceeding." *People v. Pawlaczyk*, 189 Ill. 2d 177, 191 (2000) (quoting *St. Paul Fire & Marine Insurance Co. v. Lefton Iron & Metal Co.*, 296 Ill. App. 3d 475, 487 (1998)). For an issue to be identical, "the party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation." *Savickas*, 193 Ill. 2d at 387. The application of estoppel "must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment." *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 467 (1996). Furthermore, "[t]he judgment in the first suit operates as an estoppel only as to the point or question actually litigated and determined and not as to other matters which *might* have been litigated and determined." (Emphasis in original.) *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390 (2001) (citing *Housing Authority for La Salle County*, 101 Ill. 2d at 252)).

¶ 51 The City identified two issues that it alleged were raised and conclusively decided in Givens's and Dudley's criminal cases: (1) that the police did not engage in excessive force and (2) that Givens and Dudley intentionally caused the police shooting that resulted in their injuries. We examine each contention in turn.

¶ 52 With respect to the first contention, the circuit court in the criminal case allowed Givens and Dudley to argue that the City's police officers, not they, were at fault for Strong's death because the police officers' use of deadly force was an intervening cause of Strong's death that relieved them of liability. According to the City, the centerpiece of Givens's and Dudley's defense to felony murder was that, "in attempting to escape the crime scene, they could not have anticipated the police would use deadly force that would endanger Strong's life." Since the jury convicted Givens and Dudley of felony murder, the City argues that this means the jury

necessarily rejected Givens's and Dudley's claims of excessive force by the police. The City contends, therefore, that Dudley and Givens are collaterally estopped from relitigating their claim that the police officers engaged in excessive force when they shot at the van.

¶ 53     The City is correct that the jury rejected Givens's and Dudley's intervening cause defense. Givens and Dudley argued in their criminal trial that the police officers' conduct was an intervening circumstance that broke the causal chain between their actions and Strong's death. In convicting Givens and Dudley, the jury necessarily rejected this argument. The City errs in concluding, however, that the criminal jury determined that the police officers who caused Givens's and Dudley's injuries did not use excessive force. This argument mischaracterizes the criminal proceedings and the distinct proximate cause involved in the felony murder rule. There is no evidence in the record that the jury determined that the police did not, in fact, use excessive force. On the contrary, consistent with criminal precedent, the record reveals that the issue of excessive force was not dispositive of whether Givens and Dudley were guilty of the charged offenses. See *Lowery*, 178 Ill. 2d at 471-73 (noting that Illinois felony murder principles do not require that a criminal defendant's acts constitute the sole and immediate cause of death, this court found that the proper focus of inquiry was not whether "vigilante" shooter/intended victim was legally justified in shooting the innocent bystander but whether the criminal defendant's actions set in motion a chain of events that ultimately caused the bystander's death). Instead, the jury determined that Givens's and Dudley's actions were a proximate cause of Strong's death, and the issue of whether the police's conduct was justified was not before the court.

¶ 54     For example, because the issue of excessive force was not the focus of the prior criminal trial, the circuit court barred Givens and Dudley from introducing evidence at trial of then-internal police department policy concerning the use of force. In explaining to the parties why this evidence was excluded, the circuit court stated that it was irrelevant:

"General orders of the police department are not anywhere in the jury instructions I am going to give the jury to make the determination whether these men are guilty beyond a reasonable doubt of what they are accused of.

- 19 -

That might apply to a civil case and be relevant there. It is not necessarily relevant here. ***

It is not the law that applies to this case. Those are internal matters of the Chicago Police Department between the department and the officers who work for it. For those reasons I found it irrelevant, immaterial, possibly misleading, and that's why I sustained the government's objection.

\* \* \*

*** In this trial the officers aren't on trial. [Dudley and Givens] are on trial. If the officers broke general orders, it doesn't mean that these men didn't necessarily commit criminal acts. This trial is about whether or not [Dudley and Givens] committed criminal acts. That's why we are here today. That apparently will be [a] discussion at another trial at another time perhaps."

¶ 55    In addition, during the State's closing argument in the criminal trial, the prosecutor emphasized to the jury that Dudley's and Givens's allegations of excessive force were irrelevant to the criminal charges:

"Counsel's argument about the fact that this was excessive force, that's irrelevant too. That's an issue for another day. What those police officers did, whether their actions were justified, that's an issue for another day. That has nothing to do with whether or not these two individuals committed a burglary and they set into motion a chain of events which resulted in the death of their buddy ***.

\*\*\*

*** [I]t doesn't have to be foreseeable that the police would use excessive force. That's not what the law is. *** Once you determine that these chain of events were set into motion by the fact that they committed a burglary, the rest is history.

\* \* \*

Counsel says that the police were wrong, they used excessive force. No where [*sic*] in the instructions do you see, no where [*sic*] in the instructions does it say that because you got shot [by] the police you get away with crimes. It is

not in there. *** The fact that the police shot them does not prevent you from finding them guilty.

\* \* \*

We are not hiding the fact that there were 74 or 75 cartridge cases found on the scene. The fact that those shots were fired, the fact that those officers saw Officer Papin get hit, that's irrelevant."

¶ 56　Moreover, the circuit court instructed the jury that, to convict a criminal defendant of felony murder, it was not necessary to find "that the acts of the defendant were the sole and immediate cause of death." The jury was instructed that a criminal defendant was guilty of felony murder if he committed burglary and the death of an individual resulted as a direct and foreseeable consequence of the chain of events set into motion by the burglary. Further, the jury was instructed that "[i]t is immaterial whether the killing is intentional or accidental or committed by a third person trying to prevent the commission of the offense of burglary."

¶ 57　Likewise, in rejecting Givens's and Dudley's argument that the police officers' excessive use of force was an intervening circumstance that broke the causal chain, the appellate court in the criminal appeals held that the issue was "whether Strong's *death* was a foreseeable consequence of [the] burglary, not whether the police *shooting* was foreseeable." (Emphases in original.) *Givens*, 2018 IL App (1st) 152031-U, ¶ 34; see also *Dudley*, 2018 IL App (1st) 152039-U, ¶ 27. Citing the proximate cause theory of felony murder, the appellate court held that it was reasonably foreseeable that a death would occur as a result of the criminal defendants encountering resistance during the commission of a forcible felony. *Givens*, 2018 IL App (1st) 152031-U, ¶ 34; see also *Lowery*, 178 Ill. 2d at 471 (to relieve a criminal defendant of liability for felony murder, the intervening cause must be entirely unrelated to the defendant's underlying criminal acts).

¶ 58　Based on the record before us, we find that the jury in the criminal case did not conclusively determine whether the police officers who fired their weapons at the van used excessive force. Nothing in the jury instructions permitted the jury to make a finding about the legal justification for the shooting. The criminal jury was told that it was immaterial how Strong's death occurred. The State argued that the police shooting was irrelevant to the criminal charges. In sum, the propriety of the

- 21 -

shooting was neither material nor necessary to the judgment in the criminal case against Givens and Dudley. Thus, collateral estoppel does not bar them from relitigating this issue in their civil lawsuit. See *Kessinger*, 173 Ill. 2d at 462 (for collateral estoppel to apply, a finding of fact must be both material and controlling in the prior case and material and controlling in the pending case).

¶ 59 The City's second contention is that Givens and Dudley are collaterally estopped from litigating the jury's finding that they intentionally caused the police shooting that resulted in Strong's death. Since the same shooting that caused Strong's death also caused Givens's and Dudley's injuries, the City argues that the jury in the criminal case against Givens and Dudley found that they intentionally caused their own injuries. The City argues that this precludes Givens and Dudley from pursuing their civil case based on the contributory fault principle that an intentional tortfeasor cannot recover damages from another intentional tortfeasor. See *Ziarko*, 161 Ill. 2d at 271 ("The rule prohibiting contribution among intentional tortfeasors was founded on the notion that an intentional tortfeasor, whose liability has arisen 'entirely [from the tortfeasor's] own deliberate wrong,' should not be afforded the equitable benefits of shifting a portion of that liability to another tortfeasor under principles of contribution. (W. Keeton, Prosser & Keeton on Torts § 50, at 336 (5th ed. 1984) ***.)").

¶ 60 The jury in the criminal case was not instructed to determine whether Givens and Dudley caused their own injuries because that issue was not relevant to the criminal trial. As astutely noted by the appellate court, the criminal prosecution did not conclusively determine whether, under civil standards, Givens and Dudley were by degrees willful and wanton in bringing about their own injuries in the form of the multiple gunshot wounds or whether the officers' actions proximately caused Givens's and Dudley's injuries. 2021 IL App (1st) 192434, ¶ 67. The issue of whether Givens's and Dudley's injuries were caused by their own willful and wanton conduct was appropriately reserved for a civil trial.

¶ 61 Givens's and Dudley's felony murder convictions pursuant to section 9-1(a)(3) of the felony murder statute did not establish intentionality with regard to Strong's death. See *People v. Belk*, 203 Ill. 2d 187, 197 (2003) ("whether the perpetrator intended to kill the victim is irrelevant for purposes of the felony-murder statute"). The City thus argues that the *mens rea* the criminal jury found in convicting Dudley

and Givens of aggravated battery of a peace officer (see *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 514 (1997) ("battery" is an "intentional tort[ ]")) equates to intentional willful and wanton conduct in their civil action for excessive use of police force. The City then conjoins this intentionality with the proximate cause determined in the felony murder (predicated on a forcible felony) context, wherein Dudley and Givens were determined under the felony murder rule to have proximately caused Strong's death. Extrapolating the battery intent with the felony murder proximate cause, the City then argues that the contributory fault principle it raised as an affirmative defense bars Givens and Dudley, as intentional tortfeasors who caused their own injuries, from bringing their claim pursuant to collateral estoppel principles. However, this degree of extrapolation is not "narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment" and is not supported by collateral estoppel principles. See *Kessinger*, 173 Ill. 2d at 467 (application of estoppel "must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment").

¶ 62 Although the sequence of events that culminated in Strong's death was entirely precipitated by Strong and his cohorts when they committed a violent crime, the result reached by the circuit court was not supported by collateral estoppel principles. See *Savickas*, 193 Ill. 2d at 389. The fact that Strong's death would not have occurred but for the actions of the three offenders does not preclude them from filing a civil lawsuit challenging the police officers' use of force in responding to their crimes.

¶ 63 We find cogent the Seventh Circuit's comments with regard to a similar argument regarding a federal action pursuant to 42 U.S.C. § 1983 (2012) against arresting officers for excessive force in the federal court:

"We note that there is nothing inherently contradictory about pleading guilty to aggravated battery of a peace officer and bringing a claim of excessive force. In Illinois, a person may be guilty of aggravated battery of a peace officer for either causing bodily harm to an officer or making physical contact of an insulting or provoking nature with an officer. 720 ILCS 5/12-3. Thus, a person could theoretically be found guilty of aggravated battery for crumpling up a parking ticket and throwing it at the officer's foot [citation] or poking a police officer in the chin [citation]. If a police officer responded to those relatively

- 23 -

minor insults with deadly force, a claim for excessive force would not be barred *** simply because the offender pled guilty to aggravated battery of a peace officer. A civil suit for excessive force in those circumstances would not imply the invalidity of the conviction." *Tolliver v. City of Chicago*, 820 F.3d 237, 243 (7th Cir. 2016).

¶ 64    Moreover, in their complaint, Givens and Dudley alleged that the City's officers continued to fire their weapons at the van and its occupants despite the van coming to a stop. Givens and Dudley alleged that the City's officers had reloaded their weapons and continued firing. See, *e.g.*, *Beets v. County of Los Angeles*, 669 F.3d 1038, 1042-43 (9th Cir. 2012) (holding that, although action pursuant to 42 U.S.C. § 1983 must not be used as an end run around the problem of two inconsistent judgments arising out of the same facts (*Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)), an allegation of excessive force by a police officer would not be barred by *Heck* if it were distinct temporally or spatially from the factual basis for the criminal conviction); *Gilbert v. Cook*, 512 F.3d 899, 900-01 (7th Cir. 2008) (citing *Heck*, 512 U.S. 477, for its holding that a criminal offender can file an action under 42 U.S.C. § 1983 against a public official who uses unreasonable force *after* the crime is completed); *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006) (same); *Brumitt v. Smith*, No. 3:20-cv-00260-TWP-MPB, 2023 WL 403964, *4-6 (S.D. Ind. Jan. 25, 2023) (same).

¶ 65    Thus, the City has not met its burden of showing with "clarity and certainty" that the identical question was decided in the earlier proceeding, thereby bringing it within the principles of collateral estoppel. See *Pawlaczyk*, 189 Ill. 2d at 191. Accordingly, Givens and Dudley are not barred by the doctrine of collateral estoppel from litigating their civil claims against the City for excessive police force.

¶ 66    We emphasize, however, that our decision on this issue is *limited* to determining whether Givens and Dudley are barred from litigating their civil claims based on the collateral estoppel effect of their prior criminal proceedings. We make no finding on the merits of their claims or whether they should ultimately prevail in their civil case.

B. Special Interrogatories

¶ 68    The second issue in this appeal concerns the circuit court's decision to enter judgment for the City in the estate's civil case, notwithstanding the jury's general verdict for the estate and against the City.

¶ 69    Special interrogatories are governed by section 2-1108 of the Code of Civil Procedure (Code), which, at the time of trial, stated:

> "Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specifically upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2018).

¶ 70    "A special interrogatory serves 'as guardian of the integrity of a general verdict in a civil jury trial.' " *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002) (quoting *O'Connell v. City of Chicago*, 285 Ill. App. 3d 459, 460 (1996)). Its purpose is to test the validity of the general verdict against the jury's special finding of an issue of ultimate fact. *Id.* A special interrogatory must consist "of a single, direct question that, standing on its own, is dispositive of an issue in the case such that it would, independently, control the verdict with respect thereto." *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 251 (2004); see also *Simmons*, 198 Ill. 2d at 563. If a jury's special finding of fact is inconsistent with the general verdict, the special finding controls, and the general verdict cannot stand. 735 ILCS 5/2-1108 (West 2018); *Simmons*, 198 Ill. 2d at 555. The jury's answer to a special interrogatory is inconsistent with the general verdict where it is " 'clearly and absolutely irreconcilable with the general verdict.' " *Simmons*, 198 Ill. 2d at 555-56 (quoting *Powell v. State Farm Fire & Casualty Co.*, 243 Ill. App. 3d 577, 581 (1993)). Whether the jury's answer to a special interrogatory is inconsistent with the general verdict is a question of law subject to *de novo* review. 735 ILCS 5/2-1108 (West 2018); *Brown v. City of Chicago*, 2019 IL App (1st) 181594, ¶ 42. We also exercise *de novo* review of the circuit court's grant of a

judgment notwithstanding the verdict. *Thornton v. Garcini*, 237 Ill. 2d 100, 107 (2009).

¶ 71     In the civil case below, because the City would otherwise be immune from liability for acts or omissions in the execution or enforcement of any law, the estate alleged that the officers' conduct was willful and wanton. See 745 ILCS 10/2-202 (West 2012) (under the Local Governmental and Governmental Employees Tort Immunity Act, "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct"). The estate alleged that, through its officers, the City "acted willfully and wantonly" and "without justification" in, *inter alia*, shooting Strong, shooting at the van occupied by Strong, firing weapons without justification, engaging in "contagion fire" that resulted in injury to Strong, and using force likely to cause great bodily harm or death. As an affirmative defense, the City alleged that Strong's contributory willful and wanton conduct in engaging or participating in conduct that placed police officers in imminent fear of death or great bodily harm to themselves or others served as a basis to defeat or reduce the City's liability. See *Doe v. Coe*, 2019 IL 123521, ¶ 34 ("Willful and wanton conduct is regarded as an aggravated form of negligence."). The City further maintained that its officers were justified in using deadly force. See 720 ILCS 5/7-1(a) (West 2012) (one is justified in using deadly force when "he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony"). The jury instructions reflected these allegations.

¶ 72     Moreover, the estate proceeded to trial under theories involving the City's intentional willful and wanton conduct and its reckless willful and wanton conduct. Pursuant to *Poole*, the parties agreed that special interrogatory Nos. 1 and 2 would test whether the jury's verdict found that the City was intentionally willful and wanton or recklessly willful and wanton. See *Poole*, 167 Ill. 2d at 48 (a damage award cannot be reduced by the plaintiff's contributory negligence if the defendant's willful and wanton conduct was "intentional" but can be reduced if the defendant's willful and wanton conduct was merely "reckless");[4] see also *Ziarko*,

---

[4]In *Poole*, this court held that it was unclear from the jury's verdict which type of willful and wanton conduct the defendants were found guilty of because the jury instruction "was not limited to a particular kind of willful and wanton misconduct, and no special interrogatory was submitted

161 Ill. 2d at 280. The circuit court clarified that the purpose of special interrogatory No. 2, specifically, was to test the jury's verdict pursuant to verdict form B.

¶ 73    After hearing evidence and closing arguments, the jury rendered its verdict pursuant to verdict form B. Pursuant to verdict form B, the jury found the total amount of damages suffered by the estate was $1,999,998, determined that Strong was 50% at fault, determined that the City was 50% at fault, and reduced the estate's total damages accordingly. For this verdict to stand, the jury must have concluded that the City engaged in reckless willful and wanton conduct, as opposed to intentional willful and wanton conduct or no willful and wanton conduct. See *Poole*, 167 Ill. 2d at 48.

¶ 74    This question of recklessness, as noted by the circuit court during the jury instruction conferences and at a hearing held after the jury's verdict, was tested by special interrogatory No. 2, which stated:

> "At the time deadly force was used, did the Chicago Police Officers who used deadly force engage in a course of action without legal justification, which showed an utter indifference or conscious disregard for the safety of others?"

However, the jury answered the correlating special interrogatory No. 2, intended to test the verdict entered pursuant to verdict form B, in the negative.

¶ 75    Recognizing the inconsistency of the jury's answer to special interrogatory No. 2 and its verdict pursuant to verdict form B, the circuit court entered judgment in the City's favor. The appellate court disagreed with the circuit court's judgment, finding that the jury's answers to the special interrogatories could not control the verdict because the special interrogatories were compound, vague, and confusing. 2021 IL App (1st) 192434, ¶¶ 47-50. However, in proposing the special interrogatories, the circuit court requested input or alternatives to the special interrogatories, and the estate offered none. The estate did not argue that special interrogatory No. 2 was vague, confusing, or impermissibly compound. Indeed, the estate not only acquiesced in the proffered language but acknowledged, upon the

---

to the jury to determine whether the type of willful and wanton misconduct defendants were guilty of was reckless or intentional." *Poole*, 167 Ill. 2d at 49. To be clear, *Poole* did not hold that a special interrogatory is the *only* way to ascertain the jury's finding on whether the defendant is guilty of reckless or intentional willful and wanton conduct.

circuit court's request for further clarification or input, that the special interrogatories would test and control the verdict. During closing arguments, the parties understood and emphasized that the special interrogatories questioned specifically whether the City's conduct was intentionally willful and wanton and whether the City's conduct was recklessly willful and wanton. Indeed, the estate concedes the following in its brief:

"[T]he court, counsel, and jury in our case were all acutely aware of the significance of the distinction with respect to intentional versus reckless conduct as it pertained to contribution. *** To that end, ample evidence was adduced at trial by both parties regarding whether the City's conduct was reckless versus intentional, it was debated in jury instruction conferences, and [the estate's] counsel even referenced it in opening statements and closing arguments."

The estate also asserts in its brief that, in finding the City liable and Strong to be 50% at fault, the jury must have deemed the City's willful and wanton conduct to be reckless. Yet, the jury's inconsistent finding in special interrogatory No. 2 irreconcilably conflicts with such a verdict.

¶ 76    Although the circuit court indicated, posttrial, that it could have allowed more time for objections or proposals, the estate at no time specified an objection to special interrogatory No. 2's form, offered an alternative, or requested additional time to do so. Accordingly, the estate's failure to specifically object to the form of the special interrogatory when proffered at the instructions conference forfeited any claim of error in the giving of that special interrogatory. See *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 387 (1978); see also Ill. S. Ct. R. 239(b) (eff. Apr. 8, 2013) (grounds of objection to any jury instruction shall be particularly specified). This requirement "ensure[s] that the trial court has the opportunity to correct a defective instruction and to prevent the challenging party from gaining an unfair advantage by failing to act when the trial court could remedy the faulty instruction and then obtaining a reversal on appeal." *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 557-58 (2008).

¶ 77    Moreover, it is fundamental to our adversarial process that a party forfeits his right to complain of an error where to do so would be inconsistent with the position taken by that party in an earlier court proceeding. *McMath v. Katholi*, 191 Ill. 2d

251, 255 (2000) ("A party cannot complain of error which he induced the court to make or to which he consented."). Having procured a ruling from the court in accordance with his view, a party is bound by the trial court's action in that regard. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004); *Drainage Commissioners of Drainage District No. 2 v. Drainage Commissioners of Union Drainage Dist. No. 3*, 211 Ill. 328, 331 (1904). This rule's rationale is obvious. It would be manifestly unfair to allow the estate a second trial upon the basis of error which it injected into the proceedings. See *McMath*, 191 Ill. 2d at 255.

¶ 78       Even so, special interrogatory No. 2 was not confusing or improper in form but instead presented a single, straightforward question relating to an ultimate issue of fact upon which the rights of the parties depended. See *Simmons*, 198 Ill. 2d at 563. A special interrogatory, testing the jury's verdict, must be read in context with the court's other instructions. See *id.* Here, special interrogatory Nos. 1 and 2 each mirrored one of two alternatives found in the definition of willful and wanton conduct given to the jury. The jury was instructed that "willful and wanton conduct" includes "a course of action which is without legal justification and shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for a person's own safety and or the safety of others."

¶ 79       The jury was thus instructed on the two types of willful and wanton conduct that could support a verdict in the estate's favor: (1) intentional, *i.e.*, a course of action without legal justification showing actual or deliberate intention to harm, and (2) reckless, *i.e.*, a course of action without legal justification showing an utter indifference to or conscious disregard for a person's own safety and/or the safety of others. See *Poole*, 167 Ill. 2d at 49-50. The estate made clear that it was proceeding on both theories of willful and wanton conduct, and the parties understood that a verdict pursuant to verdict form B would stand only if the City's conduct was recklessly willful and wanton, an ultimate fact that would be tested by special interrogatory No. 2.

¶ 80       Special interrogatory No. 2 included the description of reckless willful and wanton conduct and tested the verdict entered by the jury as to the specific issue of ultimate fact: was the City recklessly willful and wanton? See *Stanphill v. Ortberg*, 2018 IL 122974, ¶ 33 ("A special interrogatory is proper and must be given upon a

party's request if it tests an ultimate fact on which the rights of the parties depend."). The jury answered in the negative, thus finding that the City's conduct was not recklessly willful and wanton. It is evident from the record that the parties and the circuit court contemplated that the jury's answer to special interrogatory No. 2 would control the verdict reached pursuant to verdict form B.

¶ 81 Consistent with posttrial statements made by the circuit court, but contrary to the appellate court's holding, we find implausible the suggestion that special interrogatory No. 2 was confusing because it could have been alluding to possible passersby or innocent bystanders. The evidence, arguments, and instructions before the jury clearly set out what special interrogatory No. 2 was testing. We will not convolute the reading of this special interrogatory to conclude that the jury was confused in answering it.

¶ 82 In answering "no" to special interrogatory No. 2, the jury determined that at the time deadly force was used, the City's officers who used deadly force did not engage in a course of action without legal justification that showed an utter indifference or conscious disregard for the safety of others, *i.e.*, they did not engage in reckless willful and wanton conduct. The answer to this interrogatory, standing on its own, was dispositive of the estate's claim. The jury's negative answer to special interrogatory No. 2 was clearly and absolutely irreconcilable with the jury's verdict, which apportioned fault on both parties and was appropriate only if the City's conduct was recklessly willful and wanton. See *Simmons*, 198 Ill. 2d at 556; see also *Borries v. Z. Frank, Inc.*, 37 Ill. 2d 263, 266 (1967) ("a jury more clearly understands a particularized special interrogatory than a composite of all of the questions in a case, and therefore a special finding upon which a jury presumably has more intensively focused its attention should prevail over an inconsistent general verdict").

¶ 83 Indeed, a court "may not conclude from the mere fact of inconsistency between a general verdict and a special interrogatory that the jury was confused by the interrogatory." *Simmons*, 198 Ill. 2d at 563-64. "To do so would nullify the provision of section 2-1108 of the Code *** that states that a special interrogatory controls where there is inconsistency." *Id.* at 564; see 735 ILCS 5/2-1108 (West 2018). The purpose of a special interrogatory is to guard the integrity of a general verdict in a civil jury trial and to test the validity of the general verdict against the

jury's special finding of an issue of ultimate fact. *Simmons*, 198 Ill. 2d at 555. The Code requires that a special finding, compared to the general verdict and found to be inconsistent, controls. 735 ILCS 5/2-1108 (West 2018).

¶ 84 For these reasons, the circuit court properly held that the jury's special finding, by answering "no" to special interrogatory No. 2, related to an ultimate issue of fact upon which the rights of the parties depended and was clearly and absolutely irreconcilable with the verdict returned. See *Simmons*, 198 Ill. 2d at 555-56. Accordingly, pursuant to section 2-1108 of the Code, the circuit court properly determined that the jury's determination on special interrogatory No. 2 controlled and properly entered judgment in the City's favor. See 735 ILCS 5/2-1108 (West 2018).

¶ 85                                    III. CONCLUSION

¶ 86 For the foregoing reasons, we affirm that portion of the appellate court's judgment reversing the circuit court's order granting summary judgment in favor of the City and against Dudley and Givens pursuant to the doctrine of collateral estoppel. We reverse that portion of the appellate court's judgment reversing the circuit court's judgment notwithstanding the verdict and entering judgment in favor of the City and against the estate.

¶ 87 Appellate court judgment affirmed in part and reversed in part.

¶ 88 Circuit court judgment affirmed in part and reversed in part.

¶ 89 Cause remanded.

¶ 90 JUSTICE CUNNINGHAM, concurring in part and dissenting in part:

¶ 91 I agree with the majority's determination that the collateral estoppel doctrine does not bar Givens and Dudley from litigating their civil claims against the City. *Supra* ¶ 65. I write separately because I disagree with the majority's conclusion that the jury's answer to special interrogatory No. 2 was inconsistent with the jury's general verdict in favor of Strong's estate and against the City. Unlike the majority,

I would give effect to the jury's clear intent to find in favor of the estate and award damages to the estate.

¶ 92   The jury in this case rendered its general verdict using verdict form B. Verdict form B states: "We, the jury, find for plaintiff, Theresa Daniel, Administrator of the Estate of David Strong, deceased, and against the defendant, City of Chicago." The jury awarded damages to the estate in the amount of $1,999,998. On the same verdict form, the jury made a finding that David Strong was 50% at fault and the City was 50% at fault, for Strong's death. After reducing the estate's total damages by the percentage of David Strong's fault, the jury entered a final award of damages to the estate in the amount of $999,999.

¶ 93   The jury also answered "no" to special interrogatory No. 2, which stated:

"At the time deadly force was used, did the Chicago Police Officers who used deadly force engage in a course of action without legal justification, which showed an utter indifference or conscious disregard for the safety of others?"

¶ 94   The majority now holds that the jury's negative response to special interrogatory No. 2, standing alone, is irreconcilable with the jury's verdict in favor of the estate and against the City. *Supra* ¶¶ 75, 82. Therefore, according to the majority, the general verdict cannot stand. I disagree.

¶ 95   A jury's answer to a special interrogatory is inconsistent with the general verdict only where it is " 'clearly and absolutely irreconcilable with the general verdict.' " *Simmons v. Garces*, 198 Ill. 2d 541, 555-56 (2002) (quoting *Powell v. State Farm Fire & Casualty Co.*, 243 Ill. App. 3d 577, 581 (1993)). "If a special interrogatory does not cover all the issues submitted to the jury and a 'reasonable hypothesis' exists that allows the special finding to be construed consistently with the general verdict, they are not 'absolutely irreconcilable[,]' and the special finding will not control." *Id.* at 556 (quoting *Powell*, 243 Ill. App. 3d at 581). In making this determination, a court must exercise all reasonable presumptions in favor of the general verdict. *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 112 (2005).

¶ 96   In this case, the estate's claim against the City was for willful and wanton conduct. Willful and wanton conduct, which is regarded as an aggravated form of

negligence, is a single cause of action. *Doe v. Coe*, 2019 IL 123521, ¶ 78. There are two types of willful and wanton conduct—"intentional" willful and wanton conduct and "reckless" willful and wanton conduct. *Poole v. City of Rolling Meadows*, 167 Ill. 2d 41, 48-49 (1995). The estate chose to proceed at trial against the City on both theories of willful and wanton conduct. The jury was properly instructed that "willful and wanton conduct" could mean *either* an "actual or deliberate intention to harm" (*i.e.*, intentional) or "an utter indifference to or conscious disregard for a person's own safety and or the safety of others" (*i.e.*, reckless). The parties also addressed both theories in their closing arguments.

¶ 97        Where a plaintiff argues multiple, alternative theories in support of a claim and a special interrogatory addresses only *one* of these theories, it is axiomatic that a negative answer to the special interrogatory is not inconsistent with a general verdict because the answer, by itself, is not dispositive of the claim. See *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶¶ 118-19; *Abruzzo v. City of Park Ridge*, 2013 IL App (1st) 122360, ¶¶ 68-72; *Jablonski v. Ford Motor Co.*, 398 Ill. App. 3d 222, 273-76 (2010); *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 252-54 (2004). Here, the jury's negative response to special interrogatory No. 2, standing alone, was not inconsistent with the jury's general verdict for the estate. Special interrogatory No. 2 pertained only to "reckless" willful and wanton conduct and not "intentional" willful and wanton conduct. Based on the jury's negative response to special interrogatory No. 2, the jury could have reasonably found that the City's conduct was *not* recklessly willful and wanton but *was* intentionally willful and wanton. Such a finding would be perfectly consistent with the jury's general verdict in favor of the estate. Because there is at least one scenario in which the jury's answer to special interrogatory No. 2 and its general verdict can be read consistently, there is no "absolute" irreconcilability that supports vacating the jury's verdict. See *Brown v. City of Chicago*, 2019 IL App (1st) 181594, ¶ 49; see also *Price v. City of Chicago¸* 2018 IL App (1st) 161599, ¶ 44 (where "a reasonable hypothesis exists capable of reconciling the special finding with [the] general verdict, the two are not absolutely irreconcilable and the general verdict controls").

¶ 98        The majority rejects this reasoning. Instead, the majority holds that, in rendering its general verdict, the jury "must have concluded that the City engaged in reckless willful and wanton conduct, as opposed to intentional willful and wanton conduct

- 33 -

or no willful and wanton conduct." *Supra* ¶ 73. The majority presumes that verdict form B corresponds to a finding of reckless willful and wanton conduct, because this court held in *Poole* that a damage award cannot be reduced by the plaintiff's contributory negligence if the defendant's willful and wanton conduct was "intentional" but can be reduced if the defendant's willful and wanton conduct was merely "reckless." *Supra* ¶ 73 (citing *Poole*, 167 Ill. 2d at 48). Based on this presumption, the majority concludes that the jury's negative answer to special interrogatory No. 2, which addressed reckless willful and wanton conduct, is inconsistent with the jury's general verdict. *Supra* ¶¶ 74-75. This conclusion is erroneous, for two reasons.

¶ 99    First, the majority errs in presuming that special interrogatory No. 2 corresponded to verdict form B. Verdict form B does not mention reckless willful and wanton conduct. Indeed, it does not use the terms "reckless," "willful and wanton," or any of the specific terms included in the definition of reckless willful and wanton conduct set forth in special interrogatory No. 2 or in the jury instructions. Thus, verdict form B does not indicate whether the jury found that the defendant was liable for intentional willful and wanton conduct *or* reckless willful and wanton conduct.

¶ 100    Secondly and significantly, the jury was not made aware of the supposed "coordination" between the special interrogatories and the verdict forms. Although the attorneys and the trial court discussed their intention, and the assumption, that special interrogatory No. 2 corresponded to verdict form B, this discussion took place outside the presence of the jury and was *never* conveyed to the jury *at any time*. The jury was never informed that it should use verdict form B if it found that the defendant's conduct was recklessly willful and wanton. In addition, the jury was not instructed on the *Poole* principle that a defendant's damages may be reduced by contributory negligence *only* if the defendant's willful and wanton conduct was reckless. The majority errs in ascribing legal meaning to the jury's verdict based on legal principles of which the jury was entirely unaware. It is impossible to conclude, therefore, that the jury's negative answer to special interrogatory No. 2 is inconsistent with its general verdict for the estate simply because it used verdict form B.

¶ 101    In the absence of any evidence in the record, the majority cites a portion of the estate's brief where the estate concedes that " '[t]he court, counsel, and jury in our case were all acutely aware of the significance of the distinction with respect to intentional versus reckless conduct as it pertained to contribution.' " *Supra* ¶ 75. As the majority is aware, however, this court does not simply accept a party's concession on a factual or legal issue without first confirming its accuracy. *Beacham v. Walker*, 231 Ill. 2d 51, 60-61 (2008); *People v. Horrell*, 235 Ill. 2d 235, 241 (2009); *People v. Kliner*, 185 Ill. 2d 81, 116 (1998). We have an obligation to read the record to ascertain the correctness of a party's concession. *People v. Carter*, 2015 IL 117709, ¶ 22; *People v. Denson*, 2014 IL 116231, ¶ 10. In this case, the estate's concession has no support in the factual record.

¶ 102    Moreover, special interrogatory No. 2 was worded in such a way that a reasonable hypothesis exists that the jury's answer to the question was consistent with the verdict. As the appellate court below noted, special interrogatory No. 2 refers to the police officers' utter indifference or conscious disregard for the " 'safety of others.' " 2021 IL App (1st) 192434, ¶¶ 48-49. The jury reasonably could have concluded that this question "referenced possible passersby or innocent bystanders rather than the burglars in the van." *Id.* ¶ 49. The ambiguous language in the interrogatory may have resulted in the jury giving a negative response "even if the jury believed the officers were acting recklessly towards the van's occupants." *Id.* For this reason, as well, the jury's negative answer can be reconciled with its general verdict for the estate. The majority finds that the estate forfeited any objections to the form of the interrogatories by agreeing to them prior to trial (*supra* ¶¶ 75-78), but the issue raised in this appeal is not whether the special interrogatories should have been given to the jury. Rather, the issue is whether the jury's answers to the special interrogatories were inconsistent with the general verdict. This issue cannot be forfeited. See *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 449-50 (1997); *LaPook v. City of Chicago*, 211 Ill. App. 3d 856, 864-65 (1991).

¶ 103    With its decision today, the majority is vacating a clear, unambiguous jury verdict in favor of a poorly worded, ill-conceived special interrogatory that, as far as the jury was aware, had no connection to the verdict form. It is unprecedented for a court to nullify a jury's verdict based on the jury's answer to a special interrogatory when the legal significance of the special interrogatory was not

communicated to the jury. "Overriding a jury's verdict is a drastic step that affects public confidence in the jury system." *Brown*, 2019 IL App (1st) 181594, ¶ 58. Accordingly, there is no principled basis to vacate the jury's verdict in this case.

¶ 104    Under these circumstances, where there is no inconsistency between the jury's general verdict and the jury's special finding, the proper remedy is to disregard the jury's special finding and reinstate the judgment on the general verdict. *Id.* ¶¶ 58, 61. I would affirm the appellate court's judgment, which reversed the trial court's judgment for the defendant City of Chicago on the special interrogatories and reinstated the judgment for Strong's estate.

¶ 105    For the foregoing reasons, I respectfully dissent.


¶ 106    JUSTICES NEVILLE and HOLDER WHITE join in this partial concurrence, partial dissent.